# Exhibit 1

**VALLI KANE & VAGNINI, LLP**
*Attorneys for Plaintiff*
600 OLD COUNTRY ROAD
GARDEN CITY, NY 11530
(516) 203-7180

CV - 10  3609

RECEIVED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y.

★    AUG 0 5 2010    ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------

MOHAMMED M. AHMED;

                    Plaintiff,

         v.

T.J. MAXX CORP. and
TJX COMPANIES INC.;

                    Defendants.
--------------------------------------------------

COMPLAINT

SPATT, J.

BOYLE, M.

Plaintiff, Mohammed M. Ahmed ("Ahmed") by and through his attorneys at Valli Kane & Vagnini LLP, brings this action for damages and other legal and equitable relief from the Defendants' violation of Wage and Hour laws and those laws proscribing retaliation for complaining about such violations, stating the following as Plaintiff's claims against T.J. Maxx Corp. and its parent company TJX Companies Inc. ("TJX"), (collectively "Defendants"):

## INTRODUCTION

1.   This is an action brought by Plaintiff challenging acts committed by Defendants amounting to violations of Federal and State wage and hour law as well as the laws prohibiting retaliation for complaints relating to those statutes.  Defendants' acts of retaliation are in violation of New York State Labor Law § 215, et seq.; and the Fair Labor Standards Act, 29 U.S.C. § 201 et. seq.

-1-

## JURISDICTION AND VENUE

2.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; (iii) under 29 U.S.C. § 201 et. seq.

3.   The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

4.   Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3), in as much as this judicial district lies in a State in which the unlawful employment practices occurred.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendants maintain offices, conduct business and reside in this district.

## PARTIES

5.   Plaintiff Mohammed M. Ahmed is the person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, a male citizen of the United States and a resident of the State of New York.

6.   Defendant T.J. Maxx Corp. ("TJ Maxx") is a private corporation with headquarters located in Massachusetts and local offices located at 3221 Long Beach Road, Oceanside, NY

11572. Upon information and belief T.J. Maxx is a Massachusetts corporation licensed to do business within New York State.

7. Defendant TJX Companies Inc. ("TJX") is a private corporation with headquarters located in Massachusetts and local offices located at 3221 Long Beach Road, Oceanside, NY 11572. Upon information and belief TJX Companies Inc. is a Massachusetts corporation licensed to do business within New York State.

## FLSA COLLECTIVE ACTION CLAIMS

8. Plaintiff brings Count I, as set forth below, as a collective action pursuant to FLSA § 16(b), 29 U.S.C. § 216(b) on behalf of all Assistant Managers of Defendants TJ Maxx and TJX ("Collective Plaintiffs").

9. Plaintiff defines the FLSA Collective Class as follows:

> All Assistant Managers working for Defendants T.J. Maxx Corp. and TJX Companies Inc. three years prior to the date of filing, who have been subject to Defendants T.J. Maxx Corp. and TJX Companies Inc.'s policies of requiring Assistant Managers to perform the duties of hourly employees without proper compensation of overtime required by the FLSA.

10. During the time in question, Plaintiff has been similarly situated to all Assistant Managers of TJ Maxx Corp. and TJX Companies Inc. and has been subjected to illegal terms and conditions of employment, including failure and refusal to compensate Plaintiff and all similarly situated Assistant Managers for overtime hours worked during their employ with Defendants TJ Maxx and TJX.

11.   Plaintiff's claims under the FLSA herein are essentially the same as those of all Assistant Managers in Defendants' employ in that it is Defendants' policy to require Assistant Managers as their primary duty to perform the duties of hourly employees without proper compensation of overtime pay.

12.   The Collective Plaintiffs under Plaintiff's FLSA claim are readily discernable and ascertainable.   All Collective Plaintiffs' contact information is readily available in Defendants' records.   Notice of this collective action can be offered by first class mailings to the last known address in Defendants' possession as well as postings within the stores where these individuals are employed.

13.   All questions relating to Defendants' violation of the FLSA share the common factual basis with the Plaintiff.   No claims under the FLSA relating to the failure to compensate for overtime are specific to Plaintiff and the claims are typical of the violations of the FLSA perpetrated by Defendants.

14.   Plaintiff will fairly and adequately represent the interests of the collective class and has no interests conflicting with the class.

15.   A collective action is superior to all other methods and is necessary in order to fairly and completely litigate violations of the FLSA.

16.   Plaintiff's attorneys are familiar and experienced with collective class action litigation as well as employment and labor law litigation.

17.   The public benefits from the case being brought as a collective action as it saves the Court's time and efforts by reducing the multitude of claims to a single litigation. Prosecution of separate actions by individual Collective Plaintiffs creates a risk for varying results based on identical fact patterns as well as disposition of the classes' interests without their knowledge or contribution.

18.   The questions of law and fact are nearly identical for all Collective Plaintiffs and therefore proceeding as a collective action is ideal. Without this method, continued violations of the FLSA will undoubtedly continue.

## FRCP RULE 23 CLASS ACTION--NEW YORK STATE CLAIMS

19.   Plaintiff additionally seeks to maintain this action as a class action, pursuant to Fed. R. Civ. P. 23(b)(3), on his own behalf as well as those who are similarly situated, who, during the applicable statutes of limitations, were subjected to violations of the New York Labor Law:

20.   Under F.R.C.P. 23(b)(3) Plaintiffs must plead that the class:

    a.   Is so numerous that joinder is impracticable;

    b.   There are questions of law or fact common to the class which predominate any individual questions of law or fact;

    c.   Claims or defenses of the representative are typical of the class;

    d.   The representative will fairly and adequately protect the class; and,

    e.   A class action is superior to other methods of adjudication.

21.   The Class which Plaintiffs seek to define includes:

All Assistant Managers working for Defendants T.J. Maxx Corp. and TJX Companies Inc. six years prior to the date of filing, who have been subject to Defendants' policies of requiring Assistant Managers to perform the duties of hourly employees without proper compensation of overtime required by New York State Labor Law ("Class Plaintiffs").

## Numerosity

22. The number of class members protected by the New York State Labor Law and who have suffered under Defendants' violation of the labor law, as set forth herein, are too numerous to join in a single action, necessitating class recognition. Upon information and belief, Defendants employee several Assistant Managers at each store and have at least forty-nine stores in New York State carrying the name "TJ Maxx" and numerous others under subsidiaries which are owned and operated by Defendant TJX.

## Common Questions of Law and/or Fact

23. There are questions of law/fact that govern over the claims which are available to each and every Class Plaintiff, including but not limited to the following:

a. Whether Class Plaintiffs were scheduled to work and/or required to work more than forty hours in a work week;

b. Whether Class Plaintiffs were compensated for overtime pay pursuant to Defendants' policies;

c. Whether Defendants failed to pay Class Plaintiffs for the hours worked in excess of forty hours;

d. Whether Defendants kept accurate records of hours worked by Class Plaintiffs; and,

e. Whether Defendants have any affirmative defenses for any of these claims.

-6-

### Typicality of Claims and/or Defenses

24.    Plaintiff was employed by Defendants in the same capacity as all Assistant Managers within Defendant TJX's operations.  Plaintiff was regularly required to work in excess of forty hours in a week.  This was true for all other Assistant Managers.

25.    This common treatment included, but is not limited to, failure to pay employees the proper overtime wages

### Adequacy

26.    The representative party is no longer employed by Defendants as he has been terminated.  Plaintiff would properly and adequately represent the current and former employees who have been subjected to the treatment alleged herein.  Additionally, Plaintiff's attorney has substantial experience in this field of law.

### Superiority

27.    Any lawsuit brought by an employee of Defendants would be identical to a suit brought by any other employee for the same violations and separate litigation would cause a risk of inconsistent results.  Plaintiff has no facts relating to the class claims that are atypical from those of the class.  Upon information and belief, Plaintiff was treated identically to other employees aside from his individual claim for retaliation.

28.    Indeed, because Plaintiff is no longer employed by Defendants he will be able to further represent Class Plaintiffs by acting without fear of further retaliation and harassment. Thus, this means of protecting all of Class Plaintiffs' rights is superior to any other method.

29.    As and for the Collective Action claims brought pursuant to 29 U.S.C.S. § 216(b), Plaintiff asserts that he was treated in a similar or identical fashion to those individuals currently and formerly employed by Defendants.

## PLAINTIFF AHMED'S INDIVIDUAL CLAIMS

30. Mr. Ahmed is a 48 year old male.

31. Mr. Ahmed was hired by Defendants in or around October 17, 2008 as an Assistant Manager. He dedicated a significant period of his life to his store located at 3221 Long Beach Road Oceanside, New York. Mr. Ahmed worked between 60 and 70 hours per week. He was often required to work six days per week. He never received overtime wages for working in excess of 40 hours per week.

32. Further, Defendants showed a complete disregard for Mr. Ahmed's safety. At one point Plaintiff opened the truck to unload it and the boxes fell on top of him. He was out of work for two weeks due to his injury. When he returned Defendants had used all of his sick days to compensate him for his time off. Upon returning the first thing he was told was that he had to unload the truck.

33. If any employee wanted to call in sick they were frightened that they would be terminated for being sick. Even when Mr. Ahmed felt as if he would vomit, he could not use his accumulated sick days to leave and recuperate.

34. On a near daily basis, the store manager asked and expected Mr. Ahmed to perform tasks including cleaning the store, cleaning the bathrooms, unloading the delivery trucks three time per week, stocking the store shelves, and running the register.

35. When Mr. Ahmed requested from the store manager to have his hours reduced, the store manager refused to make any changes.

36. Mr. Ahmed asked the store manager on multiple occasions for overtime wages, but the store manager refused.

37.   In response to Mr. Ahmed's complaints about not being properly compensated for working overtime, Defendants retaliated against him.

38.   Mr. Ahmed was first written up for the first time shortly after he complained about this illegal practice.  There was no basis for the write up and when Mr. Ahmed asked for an explanation, none was given.

39.   Two other unjustified write-ups followed soon after.  The basis of these writeups was fabricated and further, Mr. Ahmed was not even responsible for the deficiencies of which he was accused.

40.   In or about July 4, 2010, in retaliation for Mr. Ahmed's opposition to the unlawful labor practices, the store manager terminated Mr. Ahmed.

## CLASS/COLLECTIVE ACTION ALLEGATIONS

41.   From the onset and throughout his employment, Defendants scheduled Mr. Ahmed to work fifty hours per week.  This was standard practice for Defendant TJX stores.  Contrary to his schedule which stated that Mr. Ahmed worked fifty hours per week, he was often required to work additional shifts, stay late or come in early.

42.   Mr. Ahmed's duties were largely unrelated to the management of the store.  He spent a majority of his time cleaning, stocking and running the cash register.  Further, the few duties he had in the back of the store consisted almost entirely of providing change for the cash registers.

43.   Upon information and belief, well over fifty percent of all of Defendants' Assistant Managers' time was spent doing duties such as cashiering, stocking shelves, cleaning bathrooms, cleaning the store, and unloading trucks.

-9-

44.   Rather than increase staff or grant overtime to hourly employees in order to assure the proper functioning of a store, upper management required Assistant Managers to work longer hours and fulfill tasks expected of hourly employees.

45.   As a result, Assistant Managers began working an excessive amount of overtime hours in order to perform the duties of hourly positions such as cashier, stock handler, and cleaning staff. Plaintiff and other similarly situated Assistant Managers were required to work up to seventy hours a week and/or six days each week.

46.   Mr. Ahmed was assigned additional duties outside the scope of his responsibilities as an Assistant Manager. These acts were performed on company time and were not compensated through the legally required overtime wages.

47.   This type of forced overtime without pay is common-place within Defendants TJ Maxx and TJX. The potential class/collective Plaintiffs have and continue to work overtime hours without statutorily required compensation.

48.   In order to effectuate this scheme and practice, upper management dissuaded employees from asking questions about overtime pay, including Mr. Ahmed and many individuals in the same or similar situation to Mr. Ahmed.

## CAUSES OF ACTION

### As and for a First Cause of Action for Violation of
### Fair Labor Standards Act

49.   The conduct alleged herein violates the Fair Labor Standards Act as Defendants have failed to compensate Plaintiff for overtime hours worked.

50.   Plaintiff's requests for relief are set forth below.

As and for a Second Cause of Action for Violation of
New York State Labor Law

51.   The conduct alleged herein violates the New York State Labor Law as Defendants
have failed to compensate Plaintiff for overtime hours worked and retaliated against Plaintiff
after he spoke out against violations of the New York State Labor Law.

52.   As a prerequisite, Plaintiff has filed notice with the New York Attorney General.

53.   Plaintiff's requests for relief are set forth below.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.   All damages which Plaintiff and the class have sustained as a result of Defendants'
conduct, including back pay, general and special damages for lost compensation and job benefits
he would have received but for Defendants' discriminatory and unlawful practices, and for
emotional distress, humiliation, embarrassment, and anguish;

2.   Front pay to Plaintiff until such time as he can be placed in the same position he
would now occupy but for Defendants' practices;

3.   Exemplary and punitive damages in an amount commensurate with Defendants'
ability and so as to deter future malicious, reckless and/or intentional conduct;

4.   Awarding Plaintiff and the class their costs and disbursements incurred in connection
with this action, including reasonable attorneys' fees, expert witness fees and other costs;

5.   Pre-judgment and post-judgment interest, as provided by law; and

6.   Granting Plaintiff and/or the class other and further relief as this Court finds

necessary and proper.

Dated:     8/3/10

Respectfully submitted,

Valli Kane & Vagnini, LLP
Attorneys for Plaintiff
600 Old Country Road, Suite 207
Garden City, New York 11530
(516) 203-7180
(516) 706-0248 (fax)

By:   _____
James Vagnini (JV - 2163)
Jesse C. Rose (JR - 2409)

To:     The TJX Companies, Inc.
770 Cochituate Road
Framingham, MA 01701

TJ Maxx Corp.
770 Cochituate Road
Framingham, MA 01701

-12-

# Exhibit 2

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x
MOHAMMED M. AHMED,

                    Plaintiff,
                                        Index No.
        -against-                       10-CV-3609

T.J. MAXX CORP., and
THE TJX COMPANIES, INC.

                    Defendant.
- - - - - - - - - - - - - - - - -x


                C O N F I D E N T I A L


        DEPOSITION of MOHAMMED M. AHMED, Plaintiff

taken by Defendants, held at the offices of

Littler Mendelson, 290 Broadhollow Road, Suite

305, Melville, New York 11747, on Thursday,

March 3, 2011, commencing at 9:55 a.m., before

Jean Wilm, a Registered Professional Reporter,

Certified LiveNote Reporter and Notary Public

within and for the State of New York.

2

1

2      A P P E A R A N C E S:

3              VALLI KANE & VAGNINI
                  Attorneys for Plaintiff
4                 600 Old Country Road
                  Suite 519
5                 Garden City, New York 11530

6          BY:  JESSE C. ROSE, Esq.

7              LITTLER MENDELSON, P.C.
                  Attorneys for Defendants
8                 290 Broadhollow Road
                  Suite 305
9                 Melville, New York 11747

10         BY:  JUSTIN R. MARINO, Esq.

11             LITTLER MENDELSON, PC
                  Attorneys for Defendants
12                1300 IDS Center
                  80 South 8th Street
13                Minneapolis, MN 55402-2136

14         BY:  ANDREW J. VOSS, Esq.

15

16

17

18

19

20

21

22

23

24

25

18

Ahmed/Confidential

1

2      about your lawsuit before you filed it?

3          A     No, no.  After.

4          Q     So when you say about your

5      complaint, are you talking about the lawsuit, or

6      are you talking about a complaint to someone at

7      T.J. Maxx?

8          A     I was talking to them about the

9      lawsuit.

10         Q     Let's start with Mr. Pena.  When did

11     you speak with Mr. Pena?

12         A     I don't exactly remember the date.

13         Q     Was it a year ago?

14         A     No.  It's right after making the

15     complaint.

16         Q     When you say "making the complaint,"

17     what do you mean?

18         A     I mean the lawsuit.

19         Q     You started the lawsuit?

20         A     Yes.

21         Q     Then you spoke with Mr. Pena?

22         A     Mr. Pena.

23         Q     Was this a telephone call?

24         A     It was a telephone call.

25         Q     What did you say and what did he

1                      Ahmed/Confidential

2    say?

3           A     I told him.

4             MR. ROSE:  Objection.

5           A     I told him about the lawsuit, saying

6    like how T.J. Maxx was treating me, meaning like

7    as a manager, I was a store manager -- I mean,

8    assistant manager, I'm sorry, and that we is

9    unloading the truck, we putting stuff on, you

10    know, from the totes to the shelf.  We clean the

11    bathrooms.  We clean the garbage.  We running the

12    registers.

13           And he said, "You're absolutely

14    right.  That's what we're doing."

15           And then I told him how, you know,

16    we are supposed to work 45 hours.  We worked 60 to

17    70 hours every week, and they call you like if you

18    are scheduled to go to work at 1 o'clock, they

19    call you 10 o'clock to go to the work, and end up

20    working 10 to close, which is 10, 10:30, 11 at

21    night.

22           And, you know, he say, "You're

23    right," and he was agreed, you know, what we have

24    all been doing -- we all doing the same thing.  He

25    said, you know, "You did the right thing."

20

1                    Ahmed/Confidential

2         Q     Other than saying "you're right" and

3    "you did the right thing," did Mr. Pena, say

4    anything else?

5                    MR. ROSE:   Objection.

6         A     No, sir.  All he said, "You're

7    right."

8         Q     He said, "You're right"?

9         A     Yes.

10        Q     He also said, "You did the right

11   thing"?

12        A     Yes.

13        Q     Did he say anything else?

14        A     No.

15        Q     Did you have any subsequent

16   conversations with Mr. Pena?

17        A     I'm sorry?

18        Q     Did you have any subsequent

19   conversations with Mr. Pena?  Any conversations

20   later?

21        A     No, sir.

22        Q     You indicated you spoke with Carl

23   Williams who was the store manager in Islandia?

24                    MR. MARINO:   Did you ever meet

25             with --

1                        Ahmed/Confidential

2          Q      Is that the salary you received when

3     you started working as an assistant store manager

4     at T.J. Maxx?

5          A      Yes.

6          Q      Did you receive that salary every

7     week that you worked until it was perhaps raised

8     at some point in your employment?

9          A      Yes.

10         Q      Did you receive that salary

11    regardless of the number of hours that you worked?

12         A      Yes.

13         Q      And that worked out to be an annual

14    salary of $59,000 per year; is that right?

15         A      Yes, sir.

16         Q      At some point during your employment

17    at T.J. Maxx, did your salary increase?

18         A      Yes.

19         Q      That was after your first year?

20         A      No.

21         Q      When was it increased?

22         A      I don't remember, but it wasn't too

23    long before I got terminated, so ...

24         Q      You were terminated in June of 2010;

25    is that right?

1                    Ahmed/Confidential

2          A     Yes.

3          Q     And so you were working from

4     November 17, 2008, until June of 2010; is that

5     right?

6          A     Yes, sir.

7          Q     Did you apply for work elsewhere at

8     any time during the period of your employment at

9     T.J. Maxx?

10         A     I applied to Target.

11         Q     When did you apply for work at

12    Target?

13         A     It was -- I don't remember exact

14    date, but before I get terminated, I tried to

15    work -- you know, tried to find a job different

16    place, because I know at T.J. Maxx, my life was

17    miserable.  I was trying to get a job in different

18    place, and I've tried, yes.  I applied at Target.

19         Q     So you applied for work at Target

20    while you were still employed at T.J. Maxx?

21         A     Yes, sir.

22         Q     What job did you apply for at

23    Target?

24         A     I don't remember the position I

25    applied for.  Probably assistant manager or store

1                         Ahmed/Confidential                    72

2       manager.  I don't remember the position.

3                Q       Was that an online application?

4                A       Yes.

5                Q       Did you get any response to the

6       online application?

7                A       No.

8                Q       Now, I understand, based on the

9       records, that you received your raise on

10      April 4th, 2010.  Does that sound right?

11               A       Yes.

12               Q       Do you remember how much the raise

13      was?

14               A       It was -- I know the final was

15      62,000, so probably $3,000, but I'm not sure it's

16      the exact amount, but around there.

17               Q       So whatever that worked out to be in

18      terms of your weekly salary, that was your new

19      weekly salary that you received until the

20      termination of your employment; is that right?

21               A       Yes.

22               Q       And you received that salary

23      regardless of the number of hours you worked?

24               A       Yes.

25               Q       Now, when you were hired as an

73

1                    Ahmed/Confidential

2    assistant store manager at T.J. Maxx, you

3    understood that you would not be receiving

4    overtime; is that right?

5          A     As assistant manager, yes.

6          Q     You would not receive overtime,

7    right?

8          A     Yes.

9          Q     Did you have any discussions with

10   Mr. Cabrera or anyone else at the time of your

11   hire regarding the number of hours that you would

12   typically be working?

13         A     Yes.

14         Q     Who did you have a conversation

15   with?

16         A     I asked Mr. Cabrera about it.

17         Q     What did Mr. Cabrera say?

18         A     He said it's 45 hours that we have

19   to work.

20         Q     Is that the typical schedule?

21         A     Yes.

22               MR. ROSE:   Objection.

23         Q     I'm sorry?

24         A     45-hour schedule, and we are

25   supposed to take an hour break.

74

Ahmed/Confidential

1

2        Q        Did Mr. Cabrera say that during

3    holiday time, you might be working more hours?

4        A        No.

5        Q        Was there any other discussion about

6    hours with Mr. Cabrera?

7        A        No.

8        Q        Did you have any other discussion

9    with anyone else at T.J. Maxx at your hiring about

10    the number of hours that you would be scheduled to

11    work?

12        A        No.

13        Q        Now, I understand that you were

14    hired as assistant store manager, right?

15        A        Yes, sir.

16        Q        Based on the records I understand,

17    at least by reference to Exhibit 3, you started

18    work on November 17, 2008; is that right?

19        A        Yes.

20        Q        Did you report to the Riverhead

21    store for training?

22        A        Yes.

23        Q        Now, I understand that at T.J. Maxx

24    the assistant store managers go through about

25    approximately a five-week training period; is that

```
 1                       Ahmed/Confidential                    75

 2    right?

 3              A      Yes.

 4              Q      Who was responsible for your

 5    training at the Riverhead store?

 6              A      Mr. Salvo was the store manager at

 7    that time.

 8              Q      Mr. Salvo?

 9              A      Salvo.

10              Q      What kind of relationship did you

11    have with Mr. Salvo as your training manager?

12              A      Well, it was a good relationship

13    as -- he was a good mentor.

14              Q      He was a good mentor?

15              A      Yes.

16              Q      At the end of the training period,

17    did you feel that you understood the managerial

18    expectations at T.J. Maxx?

19              A      Oh, actually, no.

20              Q      You did not feel that you understood

21    that?

22              A      No.

23

24

25
```

1                         Ahmed/Confidential

2                    (Document Bates-stamped

3                    MAXX0002183 through 2267 was marked as

4                    Defendants' Exhibit 4 for

5                    identification, as of this date.)

6     BY MR. VOSS:

7          Q     I am showing you a document we

8     marked as Exhibit 4, which are excerpts from the

9     ASM training program at T.J. Maxx.

10                    Have you ever seen this before?

11         A     (Perusing document.) Yes.

12         Q     Other than Mr. Salvo, was anyone

13    else involved in your training?

14         A     No.

15         Q     Now, I understand that T.J. Maxx

16    training involves a certain amount of paperwork

17    but also time out on the floor with the store

18    manager; is that right?

19         A     Yes.

20         Q     So you would go through certain

21    modules, and then you would take tests to

22    determine whether you were trained with respect to

23    those various modules?

24         A     It's supposed to be done that way,

25    but it didn't happen like that.

94

1                           Ahmed/Confidential

2          Q     Do you have any reason to believe

3     that this is wrong, that you were not the only

4     manager that was working at the store on Sunday,

5     the week of January 31st, 2009?

6                    MR. ROSE:  Objection.

7          A     Again, I don't recall this schedule,

8     sir.

9          Q     You don't recall it?

10         A     No, sir.

11         Q     So you don't know one way or the

12    other?

13         A     I'm sorry?

14         Q     You don't know one way or the other?

15    You don't know whether you were scheduled or not?

16         A     Yes, I don't know.

17         Q     Sir, I'll represent to you that

18    these are most of your schedules that applied

19    during the period that you were working at

20    T.J. Maxx, and on all of these weeks, you were

21    only scheduled five days a week.

22                    Is it consistent with your

23    recollection that you only worked five days a

24    week?

25                    MR. ROSE:  Objection.

95

Ahmed/Confidential

1

2          A       T.J. Maxx, their schedule is

3      never -- they always change their schedule.  They

4      probably write down five days, but they will call

5      you on your days off to come to work and will

6      never write down on the schedule.

7                     As you can see, all this, they

8      always white out it.  If you work early, they will

9      change it to late, and if you work late, they

10      change it to morning.  So they schedule write down

11      in here.  And it's not the same schedule they make

12      two weeks ago.  It's always changed.  When we ask

13      why schedule change, they say it's subject to be

14      changed.

15          Q       You are saying this schedule is not

16      necessarily accurate?

17          A       It's not accurate, sir.

18          Q       Where it says "L," it means you were

19      scheduled to work the late shift?

20          A       Late shift.

21          Q       Where it says "E," you were

22      scheduled to work early, right?

23          A       Yes, sir.

24          Q       You are saying to the extent this

25      document reflects that you were not scheduled to

96

Ahmed/Confidential

1

2    work on two days a week, that may or may not be

3    true; is that right?

4         A    I'm saying like when it said work

5    early, verbally they will tell you to come 5 in

6    the morning, and then you leave 6 in the evening.

7    When it says come late, they will call you come 10

8    in the morning and then you leave at 10 at night

9    or 11 at night.

10        Q    We started this conversation talking

11   about opening, and I want to get a better

12   understanding from you, sir, about who was opening

13   on Sundays when you were scheduled to work on

14   Sundays.  Did you open, or did someone else open?

15             MR. ROSE:   Objection.

16        A    If scheduled to work on Sunday, of

17   course, I will have to open the store.

18        Q    And you are opening the store by

19   yourself, right?

20        A    Not all the time.

21        Q    Most of the time?  Is that right?

22        A    Yes, most of the times, yes.

23        Q    So before you opened up the store to

24   allow customers in, you made a tour of the store

25   to make sure that it was ready for customers;

Ahmed/Confidential                                  101

1
2          Q      Sir, I'm going to direct your

3    attention again to the duties and responsibilities

4    that are listed on page 2197 under opening.  Which

5    of these duties did you not do when you were

6    responsible for opening the store?

7                 MR. ROSE:  Objection.

8          A      So when I open myself on Sunday, I

9    couldn't even read almost all of those that we

10   didn't do, because we do not have time to do this,

11   how the schedule was set up.  I couldn't do review

12   store-generated markdowns reports and planning

13   grids.  I couldn't check e-mail and voice mail.

14   We couldn't conduct the morning meetings, review

15   markdown status/markdown activity reports,

16   identify the responsibilities of key carrier and

17   guidelines and policies to adhere to for store

18   openings.

19         Q      You did not do that?

20         A      No, sir.

21         Q      So you didn't do any of those four

22   or five things?

23                 MR. ROSE:  I think he was still in

24            the middle of answering the question.

25         Q      Okay.  Go ahead.

102

Ahmed/Confidential

1

2      A        Determine payroll projection.

3      Q        You did not do that?

4              MR. VOSS:   He is just reading it.

5              MR. ROSE:   You asked him which

6          ones of the list, so he is reading the

7          list, that he didn't do.

8              MR. VOSS:   These are things that

9          he did not do?

10             MR. ROSE:   Let him answer your

11         question.

12     A        I'm reading it.  I'm trying to

13 answer like what I didn't do everything.  You want

14 me to continue?

15     Q        I want you to identify all the

16 things on this list that you did not do.

17     A        Yes, I'm reading that one by one I

18 didn't do, even though I'm supposed to do, we

19 didn't do because of the time, how schedule was

20 maintained.

21             Because as a manager, I have to work

22 on the registers, so that's how the schedule was,

23 me, maybe five other employees, where we have to

24 get seven or ten, so they cut down the hours, cut

25 down the employees.  So as the manager, you have

103

1                    Ahmed/Confidential

2    to jump on the register right away.  So a lot of

3    those things I couldn't do.

4                    Read the closing reports.

5            Q      Read the closing reports, where is

6    that one?

7            A      And review the daily lineup.  When

8    you review the daily lineup for adequate coverage,

9    you are told, if you don't have enough, whatever

10   you have, you have to work on.  So I did this.

11           Q      So you did review the daily lineup?

12           A      Right.

13                  MR. ROSE:  Let him finish

14               answering the question.  He is going

15               through the list.

16           Q      Go ahead.

17           A      I did open the controller.  I did

18   that.  I open registers and set up front line for

19   business.

20                  Review what responsibilities the

21   cleaning service is contracted to perform.  I do

22   not know what it mean by this.

23           Q      The store had a cleaning service,

24   right?

25                  MR. ROSE:  Let him finish.

Ahmed/Confidential                104

1

2          A     We never had it on Sunday.  Nobody

3    comes in Sunday.

4          Q     So the cleaning service only came on

5    other days?

6          A     It comes like once or twice in a

7    week.  I don't remember.  Us, as a manager, we

8    have to clean it.  Sunday, my job is to clean the

9    floor too.  Within 15 minutes time, I have to

10   clean the floor, and then I have to make sure,

11   bring all the registers from the back and set it

12   up for the customers.  But you get only 15

13   minutes.  And employee are scheduled to come just

14   on 11 on dot.  The store is open at 11 also.  It's

15   Sunday.

16         Q     Anything else that you didn't do

17   that is listed under opening?

18         A     I did -- I said most of the things

19   that I didn't do.

20         Q     So I understand, based on your

21   testimony that what you did do when you opened the

22   store, is you disarmed the alarm, you opened the

23   controller, you enabled or opened the registers

24   and set up the front line, you performed time card

25   edits from the previous day?

134

Ahmed/Confidential

1

2          Q       Were there other ASMs in your store

3    who provided performance evaluations to associates

4    in the store?

5          A       I don't know, sir.

6          Q       You don't know anything about that?

7          A       No.

8          Q       If you turn to page 2263, did you

9    receive training when you were hired at T.J. Maxx

10   regarding the company's corrective action process?

11         A       No.  But at the store when I was

12   working with Janet, she made me to write few

13   people up saying that -- I don't remember why, but

14   she was showing that's how you write people up.

15         Q       So you received training from

16   Ms. Sohmer who is the store manager in Commack?

17         A       Commack.

18         Q       You received training from her about

19   how to discipline associates?

20         A       Yes, I remember I did -- I don't

21   know how many people.  I remember I did write

22   correction for someone.  I do remember that.

23         Q       Did you receive any training

24   regarding the REACH program at T.J. Maxx during

25   your training period?

1          Ahmed/Confidential

2          A    No, sir, I don't remember.

3          Q    How about regarding the open door

4    policy?

5          A    No.

6          Q    No training about that?

7          A    (Shakes head.)

8          Q    How about the company's diversity

9    policy?

10         A    No.

11         Q    Did you receive any training

12   regarding Working Smart?

13         A    No, sir.

14         Q    Are you familiar with a program at

15   T.J. Maxx during your tenure called Lead, L-E-A-D?

16         A    Lead, what is it?

17         Q    It's called lead training, L-E-A-D?

18         A    No, sir, I don't remember.

19         Q    Doesn't mean anything to you?

20         A    No.

21         Q    Now, I understand after your

22   training, you were assigned initially to the

23   Commack store; is that right?

24         A    Yes, sir.

25         Q    You worked there from January 19,

                                                                    136
1                        Ahmed/Confidential

2    2009, to November 9, 2009; is that right?

3            A     Yes.

4            Q     So about ten months or so?

5            A     Yes, about ten months.  Yes.

6            Q     Then you worked at the Oceanside

7    store, also T.J. Maxx, from November 9, 2009,

8    until July 1st, 2010; is that right?

9            A     Yes, sir.

10           Q     So about eight months, right?

11           A     Yes.

12           Q     And Ms. Sohmer was your store

13   manager in Commack, right?

14           A     Yes, sir.

15           Q     And Ms. --

16           A     Terri.

17           Q     Kolski?

18           A     Terri.

19           Q     What's her last name?

20           A     I can't recall.  K-l-o-z, something

21   like that.

22           Q     Klotz, sorry.  Ms. Klotz was your

23   store manager for the majority of the time in

24   Oceanside, right?

25           A     Yes, sir.

137

Ahmed/Confidential

1

2      Q      And then there was a short period of

3    time towards the end of your employment where you

4    were supervised by Ms. Minutoli, right?

5            A      Kathy, yes.

6            Q      So you just knew her as Kathy,

7    right?

8            A      Yes.

9            Q      Do you know how many square foot the

10   Commack store was?  How large it was?

11           A      No, sir.

12           Q      Does it make sense that it was about

13   35,000 square feet?  Does that sound right to you?

14   No idea?

15           A      I don't know exact square footage.

16           Q      Was it larger than the Oceanside

17   store?

18           A      I think a little bit larger.

19           Q      Do you know what the annual revenue

20   was the year that you worked there in Commack?

21           A      No.

22           Q      How about in Oceanside?

23           A      No.

24           Q      No idea about what annual revenue

25   was generated in the stores?

1                    Ahmed/Confidential

2          Q      Anything else?

3          A      And then I was assigned to a, what

4    they call it misses department for like the

5    women's stuff.

6          Q      Misses?

7          A      Misses.

8          Q      Any other departments assigned to

9    you?

10         A      Those are that and on top of this, I

11   have to do, unload the truck.  That was my duty.

12         Q      When you say "unload the truck,"

13   what do you mean?

14         A      Meaning that the truck delivery

15   comes, merchandise comes every twice in a week, so

16   I have to unload the truck.

17         Q      Weren't there associates who worked

18   in the backroom who unloaded the truck?

19         A      There is some associates also.

20         Q      And also a backroom coordinator?

21         A      Yes.

22         Q      So in the back, you had the backroom

23   coordinator?

24         A      Yes.

25         Q      And you had, let's see, a pacesetter

145

Ahmed/Confidential

1

2    and a carton cutter, right?

3         A     Yes.   There is a few people always,

4    but again the payroll being cut and the people

5    needed in the backroom, they never had the people

6    there.  So one of us, either me or Joe or

7    Mr. Phil, one of us has to go and work with the

8    truck every week.

9         Q     So on Tuesdays and Thursdays -- I

10   understand that is when the deliveries occurred;

11   is that right?

12        A     I don't remember which day.  It

13   changes, but it's twice in the week.

14        Q     Whenever the truck would arrive in

15   the back office, the backroom, you would have a

16   backroom coordinator, correct?

17        A     Right.

18        Q     And you would have at least two or

19   three associates; is that right?

20        A     That's about right.

21        Q     And then you are saying that you

22   would be back there as an ASM as well, is that

23   what you are saying?

24        A     As one extra employee will be there.

25        Q     Sure.  Did you understand that you

146

Ahmed/Confidential

1

2   were responsible for supervising that process when

3   you were back there?

4           A       No.

5           Q       That was not your responsibility?

6           A       No.

7           Q       Who was responsible for supervising

8   that process to ensure that it was done properly?

9           A       It is coordinator in the backroom.

10          Q       And you weren't supervising the

11  coordinator?

12          A       No.  We just there as one extra

13  help.

14          Q       So you took direction from the

15  coordinator?

16          A       We took direction from the store

17  manager saying that's what you are going to be

18  doing.  Actually, as I said, everything happens at

19  T.J. Maxx what store manager says to everyone.

20  Even though every department has a coordinator,

21  assistants, but we do what the store manager tell

22  us to do.  You can't do anything wrong.  Then

23  you're in trouble.

24          Q       Did you understand that the

25  associates and the backroom coordinator in the

Ahmed/Confidential                              182

1

2          A       No.

3          Q       Next bullet point states "Prepares

4    and conducts evaluations for all respective

5    reporting associates and coordinators."

6                  You never did that?

7          A       No.

8          Q       Next bullet point states "Directs

9    merchandising work assignments through the store."

10   Did you do that?

11         A       No.

12         Q       Next bullet point states "Creates an

13   environment that fosters open communication and

14   information sharing among all associates."

15                 Did you do anything as part of your

16   managerial responsibilities as an ASM to create an

17   environment that fostered open communication and

18   information sharing in the store?

19                 MR. ROSE:   Objection.

20         A       Again, I was not responsible for any

21   of those things.   Only thing I always have to do

22   is the workload that I was given.

23         Q       And the workload that you were

24   given, you are talking about stocking shelves in

25   your departments?

183

Ahmed/Confidential

1

2          A        Stocking shelves in my department.

3      If my department don't have no totes, then I have

4      to go work in a different department.

5          Q        So stocking shelves in your

6      department or stocking shelves in another

7      department?

8          A        Another department.

9          Q        That's all you did?

10         A        Yes, sir.

11         Q        The next bullet point states

12     "Maintains and supports all company values, code

13     of conduct including, but not limited to, open

14     door, diversing workplace and maintenance of a

15     risk-free environment."

16                  Did you understand that that was

17     part of your responsibilities as an ASM?

18         A        No, no.

19         Q        No, you didn't understand that if an

20     associate had questions or concerns regarding

21     workplace conduct, that they should come to you?

22         A        No, they have to go to the store

23     manager.

24         Q        No one ever came to you with any

25     concerns about workplace conduct or harassment or

184

Ahmed/Confidential

1
2    anything like that?

3         A      With harassment, one person came to

4    me.

5         Q      Who was that?

6         A      Her name was -- there's two person

7    came to me while I was at Oceanside.  One person's

8    name is Melanie and another person name is Andrea.

9    They came to with a harassment case in two

10   different times.

11        Q      What were Melanie's concerns?

12        A      Melanie's concerns, she came to me

13   one day -- I don't remember which day -- and she

14   saying that -- actually, she came with her mother.

15   Melanie came with her mother.  It was one Sunday.

16   I was alone.

17             So one Sunday, she came in because I

18   was ringing at the register, and Melanie came in

19   the door with her mother and we had a line and she

20   wanted to speak to me.  And I said, "Okay.  Let me

21   take care of this customer and I'll go talk to

22   you."

23             So I finished with the customers and

24   then I was talking to Melanie.  She said she want

25   to speak to me.  I said, "Okay.  That's fine."

Ahmed/Confidential

1

2     Q       Did you raise it on any other

3     occasion with her?

4         A       Each time I stay late, same thing,

5     it is a retail and they needed you for whatever

6     hours, you have to stay.  You can't get overtime.

7         Q       Mr. Ahmed you understood that you

8     were paid a salary, right?

9         A       Yes.

10        Q       You weren't paid hourly?

11        A       I wasn't paid hourly.

12        Q       So when your coordinators stayed

13    late, they got overtime, if their hours exceeded

14    48 in a workweek, right?

15        A       Yes.

16        Q       They didn't get a salary?

17        A       They didn't get a salary.

18        Q       They got an hourly wage, right?

19        A       They are hourly paid, right.

20        Q       You received a salary regardless of

21    the number of hours you worked, right?

22        A       Yeah.  Well, if you work 60 hours,

23    70 hours, you get this.  But you don't work less

24    than that.

25        Q       You understood you got your salary

1                     Ahmed/Confidential

2    no matter how many hours you worked, right?

3               I'm trying to understand why you

4    asked your store manager for overtime.

5         A    Because I was told, I'm going to be

6    working only 45 hours, but I'm working 60, 70

7    hours.  So my concern is, if I work 60, 70 hours

8    constantly and I'm getting the same pay, why I'm

9    not getting more money for more hours, because I'm

10   working more than 45 hours.  That's where my

11   concern was.

12        Q    And she said, "No, this is retail,

13   you have to be available"?

14        A    "You have to be available."

15        Q    Did she say anything else?

16        A    No.  Walk away.

17        Q    Tell me about when you raised this

18   request for overtime from Ms. Klotz.  What did you

19   say and what did she say?

20        A    She said the same thing, "This is

21   retail.  You got option:  If you want to work for

22   us or you can quit."  That was her answers.

23        Q    What did you say to Ms. Klotz?

24        A    I said, "Ms. Terri, I've been --

25   supposed to work 45 hours and I'm working 60, 70

328

Ahmed/Confidential

1
2    hours every week. You calling me in even on my
3    days off, even for a little thing. You could even
4    wait for me to come next day. And I'm coming all
5    this extra time. Am I going to get paid
6    overtime?"
7                 She said, "No. You are in the wrong
8    business if you are looking for overtime. You
9    have an option: Either you work or you quit."
10   That's what Terri's exact word was.
11        Q      Did you ask to transfer to an hourly
12   position?
13        A      No.
14        Q      Why not?
15        A      I just -- at that time, I don't want
16   to go back an on hourly, because I know it's
17   working with her. Even if you go hourly and
18   employees, how she treat all of them. Terri's
19   Terri. She never change. Working with her has
20   been, you know, I just -- I never tell her that I
21   want to go back to an hourly. I never did.
22        Q      If you look at page 9 of the
23   complaint, it states, "In response to Mr. Ahmed's
24   complaints about not being properly compensated
25   for working overtime, defendants retaliated

329

1                    Ahmed/Confidential

2    against him."  Who retaliated against you?

3           A      There was her, Ms. Terri.

4           Q      Ms. Klotz?

5           A      Ms. Klotz, yes.

6           Q      She retaliated against you?

7           A      I felt.  I felt that way.

8           Q      How did she retaliate against you?

9           A      She constantly changed my schedule,

10   and then she calling me for little things.  Like

11   one thing, if she could wait for me to go

12   tomorrow, she know I'm scheduled to go tomorrow,

13   Tuesday's my day off, if something she find wrong,

14   she is going to call me and say, "Come to the

15   store."

16                 I said, "Why?  What is the problem?"

17                 "Well, that's not -- I want to speak

18   to you."

19                 "Can you wait until tomorrow?  I'm

20   scheduled to come to work tomorrow."

21                 She said, "No, you have to come

22   right now.  Terri, I live in North Babylon.  To go

23   from North Babylon to Oceanside, it's a little

24   far."

25                 She made me to do those things

378

1

2                    C E R T I F I C A T E

3

4        STATE OF New York                      :

5        COUNTY/CITY OF Nassau                   :

6

7        Before me, this day, personally appeared

8        MOHAMMED M. AHMED, who, being duly sworn, states

9        that the foregoing transcript of his

10       Deposition, taken in the matter, on the date, and

11       at the time and place set out on the title page

12       hereof, constitutes a true and accurate transcript

13       of said deposition.

14

15                          _____

16                          MOHAMMED M. AHMED

17

18

19       SUBSCRIBED and SWORN to before me this 25th

20       day of _April_____, 2011, in the

21       jurisdiction aforesaid.

22

23                          _____

24       My Commission Expires        Notary Public

25

Sara Wyn Kane
Notary Public State of New York
         KA6065479
         Nassau County
Commission Expires 10 / 16 / 20 13

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018 (212) 869-1500

# Exhibit 3

1

1

2      UNITED STATES DISTRICT COURT

3      EASTERN DISTRICT Of NEW YORK

4      ----------------------------------------------X

5      MOHAMMED A. AHMED,

6                      Plaintiff,

7           -against-                      10-CV-3609

8      T.J. MAXX CORP., and TJX COMPANIES, INC.

9                      Defendants.

10     ----------------------------------------------X

11

12     ORIGINAL        600 Old Country Road
                       Garden City, New York
13
                       January 30, 2012
14                     2:20 p.m.

15

16                     DEPOSITION of ANGELINA DUNSCOMB,

17          the witness herein, pursuant to Federal

18          Rules, held before Denise A. Caruso, a

19          Notary Public of the State of New York,

20          at the above-stated time and place.

21

22

23

24

25

2

1

2    A P P E A R A N C E S:

3

4

5    VALLI KANE AND VAGNINI, LLP.

6         Attorneys for the Plaintiff

7         600 Old Country Road

8         Garden City, New York 11530

9    BY:   DEBORAH RUBIN, ESQ.

10

11

12

13   LITTLER MENDELSON, P.C.

14        Attorneys for the Defendants

15        290 Broadhollow Road

16        Melville, New York 11747

17   BY:   JOHN T. BAUER, ESQ.

18

19

20

21

22

23

24

25

14

1                    A. Dunscomb

2        A.        Opening and closing the

3   buildings and helping them redo an area in the

4   store; resetting the departments.

5        Q.        Was that in all the stores you

6   went to help out at?

7        A.        No, the Commack store is where I

8   just went to help reset the department.  The

9   Massapequa and Selden store I helped open and

10  close the building, they were down a manager.

11       Q.        What else did you have to do

12  when you opened and closed those stores?

13       A.        Managed the processes of the

14  building, make sure everybody is doing their

15  job.  If there is a customer complaint, handle

16  the customer complaint.  Make sure the break and

17  schedules were done properly.  Just making sure

18  everybody was doing their job.

19       Q.        What's involved in resetting

20  departments?

21       A.        Sometimes you have to move

22  fixtures around and place them in areas, move

23  merchandise from one section to another section.

24       Q.        Were you involved in physically

25  moving the merchandise?

15

1                          A. Dunscomb

2          A.      Yes.

3          Q.      Do you remember when you went to

4     the Commack store to help with the reset?

5          A.      No, I don't.

6          Q.      Do you know if it was when you

7     were merchandise manager, assistant manager?

8          A.      I was the merch manager.

9          Q.      Is it fine if I refer to it as

10    merchandising ASM?

11         A.      That's fine.

12         Q.      And operations ASM?

13         A.      Yes.

14         Q.      Who sent you to these stores?

15         A.      Usually it would be coming from

16    the district manager, and they would ask the

17    store manager and then follow the chain of

18    command.

19         Q.      When would you find out that you

20    were needed to help out at another store?

21         A.      Probably about a week before you

22    had to go.

23         Q.      When you were working as a

24    merchandise ASM, how many hours did you work per

25    week?

Caruso Court Reporting, Inc.      (516) 695-3722

16

1                         A. Dunscomb

2          A.      It varied.  Because you have a

3    late night, if you worked a weekend, you could

4    work anywhere between forty to forty-eight hours

5    a week.

6          Q.      How many days per week would you

7    work?

8          A.      Five.

9          Q.      This is when you were a

10   merchandise ASM?

11         A.      Yes.

12         Q.      Were there other assistant

13   managers at the Oceanside store?

14         A.      Yes.

15         Q.      Who were they?

16         A.      They came from other stores.

17   Are you asking for the ones that went to help or

18   the ones that are in the building?

19         Q.      The ones that are in the

20   Oceanside store as their store, where they are

21   scheduled to work?

22         A.      That went to help?

23         Q.      No.

24         A.      I'm misunderstanding.

25         Q.      You worked at the Oceanside

17

1                     A. Dunscomb

2    store when you were a merchandise ASM?

3          A.      I thought you said Commack.

4          Q.      Were there other assistant

5    managers at the store when you were a

6    merchandise ASM?

7          A.      There was a staff of three then

8    the store manager.

9          Q.      Who were the three ASMs?

10         A.      At the time, it was myself, it

11   was Moe and Reynaldo then Kathy -- Miss Klotz,

12   she was the store manager at the time, but then

13   the regime changed.

14                 MR. BAUER:  The question was

15         assistant store managers?

16                 MS. RUBIN:  Yes.

17         A.      Those are the three; Mohammed,

18   myself and Reynaldo.

19         Q.      Then, so the store managers, it

20   was Miss Klotz first?

21         A.      Miss Klotz first.

22         Q.      Is that Teresa Klotz?

23         A.      Yes.

24         Q.      How long was she the store

25   manager for, do you know?

```
                                                              21

1                        A. Dunscomb

2            Q.      And now it's Betty Atz?

3            A.      Yes.

4            Q.      Did you apply for the position

5    of merchandise ASM?

6            A.      When I first applied for the job

7    for the company?

8            Q.      Yes.

9            A.      Yes.

10           Q.      Was that a paper application?

11           A.      It was online.

12           Q.      Did you have an interview?

13           A.      Yes.

14           Q.      Who interviewed you?

15           A.      Armando Cabrera.

16           Q.      Were you told about the job

17   duties --

18           A.      Yes.

19           Q.      Let me finish my question.

20           A.      Sorry.

21           Q.      Were you told about the job

22   duties of a merchandise ASM during the

23   interview?

24           A.      Yes.

25           Q.      Do you remember what he told
```

22

1                      A. Dunscomb

2    you?

3          A.      He told me that you would have

4    to open and close the building, he told me

5    registers we were on the same level when I

6    worked for Linens and Things, the type of

7    registers and how to close them.  He told me

8    about managing tasks for associates.  He told me

9    about different levels of stores like where

10   they're moving stuff around and at different

11   times of the season.

12                      I can't remember everything, but

13   that's basically the gist of it.

14          Q.      When you were a merchandise ASM,

15   did you ever receive overtime?

16          A.      No.

17          Q.      Throughout your employment with

18   T.J. Maxx, have you ever received overtime?

19          A.      No.

20          Q.      When you were hired, did you

21   receive training?

22          A.      Yes.

23          Q.      Was the training specific for

24   assistant store managers?

25          A.      Yes.

23

1                    A. Dunscomb

2          Q.      What did the training involve?

3          A.      It was a five-week training

4   program in another store.  You had a binder with

5   all the different things that you had to learn.

6   Every day you would go through the binder and do

7   that function in the store; working with the

8   store manager of that building.

9                    Then, you would have to take the

10  test, skills test.  After the first week program

11  and everything was signed off, then you would

12  get put into the store that you were hired for.

13         Q.      How long was the training each

14  day?

15         A.      Well, you worked a full shift,

16  which was like an eight-hour day.

17         Q.      Where was the training?

18         A.      My training?

19         Q.      Yes.

20         A.      Riverhead.

21         Q.      There was someone leading the

22  training?

23         A.      The store manager of that store.

24         Q.      Who was that?

25         A.      His name was Larry Wade.

Caruso Court Reporting, Inc.     (516) 695-3722

```
                                                                24
1                      A. Dunscomb
2          Q.     Larry Wade?
3          A.     Yes.
4          Q.     When you took the test at the
5   end of the training, did you have to hand it in?
6          A.     It was done on the computer.
7          Q.     Okay.  Were there other
8   assistant managers at the training?
9          A.     I don't think there was.
10         Q.     Then when you were assigned to
11  Oceanside, did you have additional training at
12  Oceanside?
13         A.     No.
14         Q.     As a merchandise ASM, did you
15  have an office?
16         A.     We all shared the same office.
17         Q.     Who is we?
18         A.     The assistant managers.
19         Q.     Did you all share the same desk?
20         A.     Well, it's hard to say, the desk
21  was like (indicating) all the way around the
22  wall, so we all had a spot.
23         Q.     Was there a computer in the
24  office?
25         A.     Yes.
```

25

1                          A. Dunscomb

2          Q.      How many computers?

3          A.      Two.

4          Q.      Was the store manager also in

5    that office?

6          A.      Yes.

7          Q.      Was one computer specifically

8    designated to the store manager?

9          A.      Not necessarily.

10         Q.      So you could you use --

11         A.      You could use either one.

12         Q.      As a merchandise ASM, how much

13   time a week would you spend in the office?

14                 MR. BAUER:  You are talking

15         about on average?

16         Q.      On average, if you know.

17         A.      I don't know, it can vary from

18   day to day.  I mean, if you have to go and do

19   e-mail, definitely have to read e-mail.  Day to

20   day, it could be anywhere between an hour to two

21   hours.

22         Q.      That's while the store is open?

23         A.      Well, you get to the store

24   before it's open.

25         Q.      Would you spend most of the

Caruso Court Reporting, Inc.      (516) 695-3722

26

1                          A. Dunscomb

2    office time in the office before the store

3    opened?

4            A.        Before it opens.

5            Q.        What kind of work do you do in

6    the office as a merchandise ASM?

7            A.        You would do time and attendance

8    to make sure the time cards were all inputted

9    properly.  If you are doing markdowns, you are

10   looking at the markdown schedule and see what

11   department has to be done.  Reading e-mail, if

12   anything is important that needs to be done

13   right away.  I think that's about it.

14           Q.        Who would you get e-mails from?

15           A.        You can get an e-mail from your

16   district manager, you can get e-mails from the

17   company, if there is something that has to be

18   pulled from the shelf, from the home office,

19   someone is looking to help a customer, looking

20   to see if you have that item in your store,

21   maybe you can help them out.

22                     Truck schedules coming in from

23   the truck DOC.  I'm trying to think what else.

24   Letters from, you know, e-mails from, um, the

25   home office, your district secretary sends you

2176b099163eb876

27

A. Dunscomb

1

2    e-mails about certain things that have to be

3    sent in and out at a certain time, certain

4    things getting done on a certain day.

5          Q.      When you were a merchandise

6    assistant store manager, how often would you get

7    e-mail from the district manager's secretary?

8          A.      She sends things out almost

9    every day to remind you that certain things have

10   to be done.

11         Q.      Would you also get daily e-mails

12   from the company?

13         A.      Yes.

14         Q.      Did you have an individualized

15   e-mail address when working as a merchandise

16   ASM?

17         A.      We all have the same e-mail

18   address as merch, merch or ops, we are all in

19   the same e-mail.

20         Q.      You share that e-mail?

21         A.      We all share that.

22         Q.      Does the store manager have an

23   individualized e-mail address?

24         A.      Yes.

25         Q.      Does the store manager ever send

28

1                        A. Dunscomb

2     you e-mails?

3          A.      No.

4                  MR. BAUER:  Objection to form.

5          What?

6          A.      No.  We are in the same

7     building.  We have a com logbook for that.

8          Q.      What is that?

9          A.      It's a com logbook.  It's a

10    communications logbook, something important gets

11    written in that to let other people who aren't

12    in the building know what's going on.

13         Q.      Who can write in the com

14    logbook?

15         A.      All the assistant managers and

16    the store manager.

17         Q.      Are you familiar with the term

18    key carrier?

19         A.      Yes.

20         Q.      What is it?

21         A.      The key carrier is an associate

22    that is a step up from the coordinator, she's

23    able to open and close the building on certain

24    days when needed.  She takes -- steps into the

25    manager's shoes, so to speak, to run the whole

31

1              A. Dunscomb

2    Inputting people's days off in the schedule,

3    because they have to go in at a certain time

4    before the next schedule rolls out.

5          Q.     What were the store hours for

6    the Oceanside store?

7          A.     What do you mean?

8          Q.     When the store was opened?

9          A.     9:30 to 9:30, Monday through

10   Saturday; 11:00 to 8:00 on Sunday.

11         Q.     The Riverhead store hours?

12         A.     Same hours.

13         Q.     When you are opening the store

14   as a merchandise ASM, what time would you have

15   to get to the store?

16         A.     We open the building at 7:00

17   a.m.

18         Q.     A typical day for you would end

19   at what time?

20         A.     From 7:00 a.m, it would be 5:00.

21         Q.     If you were closing the

22   building, what time would you come to the store?

23         A.     In Oceanside, I was there at

24   12:30 until about a quarter to ten.

25         Q.     For Riverhead, if you were

32

1                          A. Dunscomb

2    opening, when would you arrive?

3          A.      One to a quarter to ten; 1:00

4    p.m. to a quarter to ten.

5          Q.      That is if you are closing a

6    store, right?

7          A.      That is if I'm closing a store.

8          Q.      What if you are opening?

9          A.      Seven to 5:00.

10         Q.      You stayed past 5:00 on days

11   that you opened?

12         A.      Yes.

13         Q.      How often?

14         A.      Um, three times a week, through

15   my own accord though.

16         Q.      Have you stayed past 9:45?

17         A.      Yes.

18         Q.      How often?

19         A.      Maybe three times a week,

20   cleaning the store.

21         Q.      You'll take the time to clean

22   the store?

23         A.      Yes.

24         Q.      What's involved in that?

25         A.      Just making sure the merchandise

Caruso Court Reporting, Inc.      (516) 695-3722

33

1                          A. Dunscomb

2    is presentable at the time for opening, things

3    are hung up, put away neatly, nothing is

4    disheveled.  Registers get closed down and put

5    away, money gets put into the safe, locked away.

6                    I have to perform the closing

7    through the system, make sure all the registers

8    closed on time, print the sales report.

9           Q.      Would you say you've stayed a

10   little bit past 5:00 three times a week

11   throughout your employment when you are opening

12   the store?

13          A.      Not every week I've stayed.  It

14   depends on how the condition of the store is.

15          Q.      What are productivity sheets?

16          A.      It's, um, the truck that comes

17   in and out comes three times a week, and there's

18   a standard on how we take that truck in and how

19   many boxes are taken in an hour, just processing

20   it to the floor, that has to be filled out.

21   It's another tool I use to make sure everybody

22   is functioning the way they should be

23   functioning and moving the merchandise to the

24   standards.

25          Q.      You fill out the sheet?

Caruso Court Reporting, Inc.      (516) 695-3722

34

1                          A. Dunscomb

2          A.      I fill out the sheet.

3          Q.      Where does the sheet come from?

4          A.      It was just a step that we were

5    taught to do, just another tool to make sure

6    merchandise gets pulled out of the stockroom on

7    time instead of sitting stagnant there.

8          Q.      Who determines your work

9    schedule?

10         A.      I never thought of that.  I

11   determine what the day is on my own or what has

12   to be done, assessing the building when I come

13   in in the morning, see whether we are in

14   markdown mode or a truck day.  If it is a truck

15   day, we prepare for that truck to come in as

16   soon as we walk in the building.

17              8:00 is when I kind of set the

18   standard to come in and bring that truck in.

19              MR. BAUER:  I think she was

20         talking about who determines what days

21         of the week you work?

22              MS. RUBIN:  I was.

23         A.      She said what determines what I

24   do for the day.

25         Q.      I said your work schedule, that

35

1                         A. Dunscomb

2      could be interpreted differently.  It's okay.

3              A.      Who does my schedule, the store

4      manager.

5              Q.      How often are those schedules

6      made?

7              A.      They are done in a month.

8              Q.      So once a schedule --

9              A.      Once a month the schedule is up.

10             Q.      Is that the same for the

11     Oceanside store and the Riverhead store?

12             A.      Yes.

13             Q.      The store manager always made

14     the schedule?

15             A.      Yes.

16             Q.      Who makes the schedule for the

17     associates?

18             A.      The assistant manager does, um,

19     depending on who's in the building, but it's

20     solely responsible for the ops manager to do it.

21     If I'm on vacation, every other one of the

22     managers have the capability to do the schedule

23     as well as I do.

24             Q.      So as an ops ASM you've made the

25     associates schedule?

36

1                          A. Dunscomb

2          A.      Yes.

3          Q.      What's involved in making the

4    schedule?

5          A.      Well, we have a system called

6    Kronos right now.  On Monday I would go in and

7    make sure everybody's days off for that week

8    that we are doing is set in, and preset certain

9    -- like the backroom, certain hours for them.

10                        Then, on Tuesday it optimizes

11   and it pops everybody's schedule in according to

12   their availability and what is needed for the

13   business, and then I go in and I look and see

14   what unscheduled shifts need to be filled and

15   try to fill those other associates into those

16   positions.

17         Q.      Now, if you are not able to make

18   it into work on a day that you are scheduled to

19   work, is there a certain protocol that you have

20   to follow?

21         A.      Yes.

22         Q.      What is that?

23         A.      We have to let the district

24   manager know and the store manager know that we

25   can't make it into work.

37

```
 1                          A. Dunscomb
 2              Q.      Is that the case for Oceanside
 3      and Riverhead?
 4              A.      Yes.
 5              Q.      Have you ever been called in on
 6      a day that you were not scheduled to work?
 7              A.      Yes.
 8              Q.      How often is that?
 9              A.      Maybe one time.
10              Q.      Okay.  You were able to go in?
11              A.      Yes.
12              Q.      When you were hired, were you
13      told how many hours you were expected to work?
14              A.      Yes.
15              Q.      What were you told?
16              A.      Forty-eight hours.
17              Q.      Per week?
18              A.      Yes.
19              Q.      Who told you that?
20              A.      Armando Cabrera.
21              Q.      Have you ever complained about
22      the hours you work?
23              A.      No.
24              Q.      Have you heard other assistant
25      managers complaining about their hours?
```

Caruso Court Reporting, Inc.      (516) 695-3722

38

A. Dunscomb

1

2      A.      I don't remember anybody

3   complaining, no, I don't remember anybody

4   complaining.

5      Q.      Okay.  So, when you open the

6   store, can you walk me through what you do --

7      A.      Sure.

8      Q.      -- as a merchandise assistant

9   manager?

10      A.      It would be the same for

11   everybody.

12      Q.      Is it the same for merchandise

13   and operations?

14      A.      Oh, yeah.

15      Q.      Can you tell me what you do?

16      A.      When you walk into the building,

17   you have to walk into the building with an

18   associate, you can't walk in there by yourself.

19   So you walk into the building, you have to

20   de-arm the building.  Once you de-arm the

21   building, put your stuff down.  Usually I would

22   read what is in the com logbook if I wasn't in

23   the building the night before or the day before

24   to catch up on something that might have to be

25   done right away.

41

1                          A. Dunscomb

2              Q.      Would you say you do it once a

3      week?

4              A.      Running merchandise, I can say I

5      do it almost every day, but I don't do it on a

6      daily basis.  I never spend the whole day doing

7      it, I have other things I'm doing.

8              Q.      How much time per day do you

9      think you spend running merchandise?

10                     MR. BAUER:  As a merchandise ASM

11             or an ops ASM?

12                     MS. RUBIN:  She said the duties

13             were the same.

14                     MR. BAUER:  On opening she said

15             they were the same and then you said

16             once the store opens, then you get into

17             a whole line of questioning.

18                     MS. RUBIN:  We can distinguish.

19             Q.      As a merchandise ASM?

20             A.      As a merchandise ASM, it's part

21     of your job to make sure merchandise is getting

22     run out.  If you have to do it, as well along

23     side someone, then yes, you do it, it's part of

24     your job.

25             Q.      How much time per day would you

42

1                    A. Dunscomb

2    spend running merchandise as a merchandise ASM?

3         A.        Probably maybe forty percent of

4    the day.

5         Q.        As an operations ASM?

6         A.        Maybe twenty percent of the day.

7         Q.        Have you seen other assistant

8    managers running merchandise?

9         A.        Sure.

10        Q.        Similar percentages?

11        A.        Yes.

12        Q.        What else do you do once the

13   store is now open?

14        A.        Now it's a coaching thing,

15   making sure that associates are doing the

16   functions of their job properly and doing the

17   best methods, procedures, the ringing

18   procedures, make sure everything is getting done

19   the proper way.  If there is a new associate,

20   you are coaching that associate on how the job

21   should be done.  It's basically coaching and

22   making sure the whole scope of the store is

23   being run properly.

24        Q.        Have you ever run the register

25   as a merchandise ASM?

43

1                          A. Dunscomb

2          A.      Yes.

3          Q.      How often?

4          A.      Not too often, you jump in and

5    just ring to get the line going so the customer

6    is happy.  If there is a long line and they are

7    starting to complain, you want to move the line

8    faster.

9          Q.      Would you say you do that on a

10   daily basis as a merchandise ASM?

11         A.      Jumping in every now and then,

12   sure.

13         Q.      What about as an operations ASM?

14         A.      If I had to jump in on a

15   register, yes.

16         Q.      Daily?

17         A.      I don't do it as much as an ops

18   manager, I have a bigger staff to take care of

19   that.

20         Q.      Have you heard of door to floor?

21         A.      Yes.

22         Q.      What is that?

23         A.      Door to floor is how we take our

24   truck in.  It's door to floor in two hours, the

25   whole entire truck should come in and out to the

44

1                          A. Dunscomb

2      floor.

3              Q.      In two hours?

4              A.      In two hours.

5              Q.      Are you able to do that?

6              A.      Sometimes no, sometimes yes.

7              Q.      As both a merchandise ASM and an

8      operations ASM?

9              A.      Yes.

10             Q.      As a merchandise ASM, what is

11     your involvement in the door to floor procedure?

12             A.      Making sure the product is

13     getting run out to the floor the way it should

14     be on the floor; tagged and centered and

15     heatered and all the things that have to go with

16     it.

17                     As an ops manager, I'm actually

18     more involved in the process of the truck; the

19     way it comes in and how the girls are doing

20     everything.

21             Q.      As a merchandise ASM, do you

22     assist in getting --

23                     MR. BAUER:  Are you are talking

24             in a present tense?  You said ops or

25             merchandise?

45

1                           A. Dunscomb

2          Q.      As a merchandise ASM, were you

3     involved in getting merchandise out onto the

4     floor?

5          A.      Yes.

6          Q.      How?

7          A.      Moving the merchandise out,

8     making sure there's an associate that has to

9     take care of it.  If there is not product to get

10    out so we can do the business we need to do

11    then, yes, I would put it out.

12         Q.      How often would you put it out?

13         A.      I don't know, about more than

14    half of the time when I was -- fifty percent.

15    I'm still doing it, I mean, moving the

16    merchandise out is for the better of the

17    business.

18         Q.      It's an important task?

19         A.      Yes, it is.

20         Q.      You have to tag the merchandise?

21         A.      The girls in the back tag it.

22         Q.      You are not involved in that?

23         A.      No.

24         Q.      As a merchandise ASM, you were

25    not involved?

46

1                     A. Dunscomb

2          A.      Yes, if it was at the register

3    and I was taking merchandise back that needed to

4    be tagged, yes.  You don't put it back on the

5    floor unless it's the right way.

6          Q.      How long did it take to unload

7    the truck as a merchandise ASM?

8          A.      It should take about an hour.

9          Q.      Is that how long it took?

10         A.      Sometimes two, depending on the

11   load, how big the load was.

12         Q.      You would get boxes on the

13   truck?

14         A.      Yes.

15         Q.      How many boxes at the Oceanside

16   store?

17         A.      It varied.  It varies anywhere

18   from three hundred boxes to six hundred boxes.

19   It depends on how they sent the truck out from

20   the truck DC.

21         Q.      How many hours would it take to

22   get everything out onto the floor as a

23   merchandise ASM?

24         A.      I don't know.  Maybe an hour,

25   two hours.

47

1                          A. Dunscomb

2          Q.      So what is your involvement with

3   the door to floor as an ops ASM?

4          A.      I actually make sure the process

5   of the door to floor is being done properly and

6   the right amount of people are in the right spot

7   and taking less steps in doing what needs to be

8   done in their station.

9          Q.      Do you ever run merchandise out

10  to the floor as an ops ASM?

11         A.      Yes.

12         Q.      How often?

13         A.      I don't know; one or two times

14  out of the week.

15         Q.      Are there more associates

16  scheduled to work on truck days than non-truck

17  days?

18         A.      As far as like, um, taking the

19  truck in?

20         Q.      Yes.

21         A.      Yes.

22         Q.      How many more?

23         A.      How many more are scheduled for

24  the truck?

25         Q.      For the truck, yes.

51

                                    A. Dunscomb

1   no, you don't have to use the guidelines.

2       Q.      What happens after the

3   interview?

4       A.      Then you have to do a reference

5   check, and then if the references check out, an

6   associate is the right mix, then you call them

7   -- you can call them in for an orientation.

8       Q.      Do you have to discuss the

9   applicant with the store manager?

10              MR. BAUER:   Objection to form.

11          You can answer.

12      A.      Not really, you don't have to

13  ask her.  Well, the store manager, you could, I

14  mean, if you are uncomfortable with making that

15  decision yourself, then you can team up with the

16  store manager and discuss it and see what the

17  needs are, you know, whether we need that

18  person.

19      Q.      Can you hire someone without any

20  additional approval?

21      A.      Yes.

22      Q.      The district manager does not

23  have to approve the hiring?

24      A.      The only, um, approval that you

52

1                        A. Dunscomb

2    need from the district manager is if there is an

3    assistant manager, that would be the store

4    manager that does that, um, I don't hire

5    assistant store managers.  A coordinator you

6    have to marry up with the district manager, if

7    there is a need for the coordinator.  If there

8    is no need for the coordinator, then you

9    wouldn't even hire a coordinator.

10                   MS. RUBIN:  Quick break.  Couple

11         of minutes.

12                   (Recess taken.)

13                   MS. RUBIN:  Back on the record.

14         Q.        As an ops ASM, what is your

15    involvement in interviewing?

16         A.        The same as the assistant.  Spot

17    interviewing, and if they like them, bring them

18    in and do all the interviewing and the reference

19    check and the orientation and all that.

20         Q.        As a merchandise ASM, were you

21    involved in providing training to associates?

22         A.        Yes.

23         Q.        How?

24         A.        It depends what job they were

25    doing, what they were learning.  If it was a

53

1                              A. Dunscomb

2    cashier, you train them on how the ringing

3    procedures were and the steps to make it

4    efficient and letting them -- watching them

5    train and doing the skills testing that was

6    involved in that job function.

7                    When they were on the register,

8    you just sat back and made sure they were doing

9    the proper procedure.  If there was something

10   they did wrong, then you correct that procedure.

11           Q.        Is there any formal training for

12   associates?

13           A.        Like?

14           Q.        Like a classroom setting or --

15           A.        The orientation is, how I do it

16   is like a classroom because I bring them in,

17   they

18   do -- I explain what the whole scope of the

19   company is, what their job is.  They fill out

20   the paperwork, we do a tour of the store, make

21   sure that, um, they know where everything is in

22   the store.

23                    Then I team them up with someone

24   like a buddy, where I'm going to place them, to

25   help learn the abilities of that area for maybe

72

1                          A. Dunscomb

2    look like?

3                    MR. BAUER:  Objection to form.

4          She can answer it.

5          A.       The end caps, sometimes they

6    tell you, if there's a holiday, like Valentine's

7    Day is coming up, feature Valentine's Day on an

8    end cap.  It's not a specific this is what goes

9    on each of the ends of the end caps, you are

10   able to take Valentine's Day and put it on the

11   end cap.

12                   If it is Christmas, sometimes

13   most of all your end caps will have Christmas on

14   it, but it will be to what is actually in the

15   run, so to speak.  Like the towel aisle, coming

16   off the end of the we will have Christmas

17   towels.

18         Q.       Do you discuss the end caps and

19   how they will be set up with the other assistant

20   managers?

21         A.       Sometimes we like to talk to

22   each other.  Sometimes you bounce an idea off of

23   someone to see what they are thinking and what

24   you are thinking, and maybe the two come to a

25   median and come together with something that

73

```
 1                    A. Dunscomb
 2   looks nice.
 3          Q.      When you were a merchandising
 4   ASM, was the store manager involved in setting
 5   up the end caps?
 6          A.      Sometimes.
 7          Q.      Have you ever been told by the
 8   store manager that they didn't like how you set
 9   something up?
10          A.      No.
11          Q.      Have you ever had to clean the
12   store?
13          A.      Cleaning in what way?
14          Q.      Mop, sweep?
15          A.      Yes.
16          Q.      At Oceanside?
17          A.      Yes.
18          Q.      At Riverhead?
19          A.      Yes.
20          Q.      When you visited other stores?
21          A.      No.
22          Q.      What kind of cleaning have you
23   done at Oceanside?
24          A.      If somebody spills something on
25   the floor you have to go and clean it up, you
```

Caruso Court Reporting, Inc.      (516) 695-3722

74

1                     A. Dunscomb

2    don't want anybody to get hurt.  I've cleaned

3    the bathrooms.  I live kind of far from the

4    store so I like to have a clean bathroom.  If

5    someone makes a mess, you want to make sure that

6    the other customers aren't seeing a dirty

7    bathroom, I've done it.  I've cleaned the break

8    room because I have to eat in it and I want to

9    eat in a clean place.  Cleaned up the registers,

10   you know, just hangers and stuff put away so it

11   is not messy.  You want to give a better

12   appearance to customers than having them look at

13   a dirty counter.  I've done those things in

14   Riverhead, too.

15          Q.      When you were at Oceanside, did

16   you take breaks?

17          A.      Yes.

18          Q.      How often?

19          A.      Every day I took a break.

20          Q.      How long was your break?

21          A.      An hour.

22          Q.      Is that a lunch hour?

23          A.      That was my lunch hour.

24          Q.      At Riverhead, do you take

25   breaks?

75

1                          A. Dunscomb

2         A.        Yes.

3         Q.        Also an hour?

4         A.        Uh-huh.

5                   THE REPORTER:  Yes or no?

6                   THE WITNESS:  Yes, I'm sorry.

7         Q.        Do you take an hour every day

8    that you are at work?

9         A.        Yes.

10        Q.        At Oceanside as well?

11        A.        Yes.

12        Q.        When you were working at

13   Oceanside, did you ever bring work home with

14   you?

15        A.        Sometimes.

16        Q.        What kind of work did you bring

17   home?

18        A.        The um, maybe the e-pack to read

19   up, like if we were doing the Christmas things,

20   just to plan ahead, what had to be done.

21        Q.        You said e-pack?

22        A.        Yes, e-pack, it's what the

23   company gives out every week of upcoming things

24   that are going to be done.  It's the information

25   guide comes out every week.

94

1                    A. Dunscomb

2    you know, moving racks and stuff.

3         Q.      Was there already a men's gift

4    area in the store?

5         A.      It's the holiday, you get more

6    of a product coming in for the men's gifts for

7    Christmas so you get more of an area you had to

8    fill.

9         Q.      It wasn't yet filled?

10        A.      No, it wasn't yet put in place

11   for the holiday, he made a suggestion on what

12   area of the store we were going to house the

13   men's gift area for the holiday.

14        Q.      Is that where the men's gift

15   area for the holiday ended up being housed?

16        A.      Yes.

17        Q.      Anything else happen when you

18   went around with the district manager?

19        A.      No, he just talked about sales

20   and a pat on the back on different departments

21   the way they looked, that's about it.

22        Q.      Riverhead, does the district

23   manager visit the store?

24        A.      Yes.

25        Q.      How often?

95

1                    A. Dunscomb

2         A.      She comes about once a month.

3         Q.      How long are her visits?

4         A.      Probably about three hours.

5         Q.      Is the store manager always

6    there when she visits?

7         A.      Yes -- no, I'm sorry.  She came

8    once without her, she's was on vacation.

9         Q.      What does the district manager

10   in Riverhead do on her visits?

11        A.      She walks the floor and checks

12   what areas look like and what is working and

13   what is not working and makes her suggestions on

14   where we should put certain things.

15        Q.      You say we, are you referring to

16   the other assistant managers?

17        A.      Yes.

18        Q.      And the store manager?

19        A.      Yes.

20        Q.      Do you follow those suggestions?

21        A.      Not necessarily so.  If I can

22   prove otherwise a better location or a better

23   decision, then I can do that.

24        Q.      Is that during a visit or would

25   you do that after the visit?

96

1                          A. Dunscomb

2          A.       During the visit we would talk

3     about it, but -- and that's how I would get what

4     I was trying to get across.  Sometimes she's not

5     there and we are looking at the numbers in the

6     reports and said we should do this and we do it

7     ahead of time, then when she gets there, then we

8     show her.

9          Q.       Has she ever been unhappy with

10    how you set up the store?

11         A.       No.

12         Q.       Other than the district manager,

13    have any other employees from T.J. Maxx come

14    into the Riverhead store to visit?

15         A.       Regular associates or higher up

16    in the district?

17         Q.       Higher up than the district

18    manager?

19         A.       Yes.

20         Q.       Who?

21         A.       Celine.

22         Q.       Who is that?

23         A.       She's the VP of the company.

24         Q.       How often does she come in?

25         A.       I've only -- in the Riverhead

```
                                                           97
 1                          A. Dunscomb

 2    store, I've only seen her once.

 3              Q.      Have you heard from other

 4    employees in the Riverhead store that she comes

 5    in more than that?

 6              A.      No.

 7              Q.      When you were -- any other

 8    higher-ups come into the Riverhead store?

 9              A.      She comes just, you know, to see

10    the store.

11              Q.      When you were at the Oceanside

12    store, did any other T.J. Maxx employees above

13    the district manager come into the store?

14              A.      Yes.

15              Q.      Who?

16              A.      Celine is the VP.

17              Q.      Celine again?

18              A.      Yes, but she's the one who is

19    higher.

20              Q.      She's the level above the

21    district manager?

22              A.      No, she's higher than that.

23              Q.      She's higher?

24              A.      Yes, they just come to see what

25    the store looks like.
```

104

1                          A. Dunscomb

2          Q.      During the -- every single day

3    is there always an MOD?

4          A.      Yes.

5          Q.      Throughout the day?

6          A.      Throughout the day.

7          Q.      Does that person change?

8          A.      Yes.

9          Q.      Who creates the MOD schedule?

10         A.      The manager that works Sunday

11   before they open, usually takes the manager's

12   schedule and creates an MOD list for --

13   according to everybody's schedule.

14                 MS. RUBIN:  Do you need a break

15        or you are okay?

16                 THE WITNESS:  I'm fine.

17                 MS. RUBIN:  Are you okay?

18                 MR. BAUER:  Yes.

19         Q.      Do you know what the labor

20   budget is for the Riverhead store?

21         A.      The labor budget?

22         Q.      Yes.

23         A.      What do you mean by that.

24         Q.      Do you have a labor budget?

25         A.      You might be saying it

105

A. Dunscomb

1

2  differently than I'm accustomed to.  Do you mean

3  the wages of the associates, the minimum wages

4  or the budget of the scheduling?

5       Q.      The budget of the scheduling.

6  What do you refer to it as?

7       A.      Our budget.

8       Q.      What is the budget for the

9  Riverhead store?

10      A.      It depends on what the plan is

11 for the month, it's broken down into several --

12 so every week it's broken down to a certain

13 amount of dollar amount that you are able to

14 spend as far as budgeting for the schedule.

15      Q.      Is there a range that the budget

16 goes between?

17      A.      Well, the company decides on

18 your budget according to what you did in sales

19 last year to what they plan you to this year

20 then they establish a budget for you.

21      Q.      Has the budget at Riverhead

22 stayed around the same dollar amount?

23           MR. BAUER:  Objection as to

24      form.  You can answer.

25      A.      I couldn't answer that one, I

Caruso Court Reporting, Inc.      (516) 695-3722

106

1                          A. Dunscomb

2   don't know.

3          Q.       Do you review the budget?

4          A.       I do review the budget, but I've

5   only been there a year, so I don't know what

6   their budget was there for prior.  I only know

7   what I know now.

8          Q.       Has your budget been consistent

9   since you have been there?

10         A.       We are at the slow period, so it

11  has gone down a lot.  We are just coming out of

12  a holiday.

13         Q.       Is it higher during the holiday?

14         A.       Yes.

15         Q.       Does that affect how associates

16  are scheduled?

17         A.       It affects how much you are

18  spending on your budget and how many associates

19  are coming in at the time.

20         Q.       At the lower budget, does that

21  correlate to less associates working?

22         A.       Not necessarily so, it depends

23  on their hourly rate.  Like if you have a

24  higher-salaried person and you use a

25  lower-salaried person, you still have more

107

1                      A. Dunscomb

2    flexibility to bring in more people.

3         Q.      As an operations ASM, do you

4    have the authority to give overtime to an hourly

5    employee?

6         A.      There's no overtime.  We don't

7    give overtime.

8         Q.      Why not?

9         A.      It affects your budget, you

10   know, you are not the only store in the

11   district, we all operate on what the whole

12   district is operating on.

13        Q.      When you were at Riverhead --

14        A.      I don't give overtime.

15        Q.      Have their been times when you

16   want to give overtime?

17        A.      No.

18        Q.      Have there been times when you,

19   being the store, required that someone work

20   overtime?

21             MR. BAUER:  Asked and answered.

22        She just answered that question.

23             THE WITNESS:  Yeah, no.

24             MS. RUBIN:  Okay.

25        Q.      At Oceanside, did you have the

108

1                          A. Dunscomb

2       ability to give overtime?

3               A.      No.

4               Q.      Did you ever want to give

5       overtime?

6               A.      No.

7               Q.      Why not?

8               A.      It wasn't necessary.

9               Q.      Do you know what the sales

10      volume is of the Riverhead store?

11              A.      It's fourteen point five nine.

12              Q.      When you were working at

13      Oceanside, what was the sales volume?

14              A.      About seven million.

15              Q.      At Oceanside, was there a dress

16      code?

17              A.      Yes.

18              Q.      What was the dress code?

19              A.      Business casual, no blue denim.

20              Q.      Did that dress code apply to all

21      employees?

22              A.      Yes.

23              Q.      Including assistant managers and

24      store managers?

25              A.      Yes.

109

1                        A. Dunscomb

2          Q.      As a merchandise ASM, did you

3    have any say in the dress code?

4          A.      No, that was the company

5    standards.

6          Q.      At Riverhead, is there a dress

7    code?

8          A.      Yes.

9          Q.      What is that dress code?

10         A.      Business casual, no blue denim.

11         Q.      Same for all employees?

12         A.      Same for all employees.

13         Q.      Do you have any say in the dress

14   code?

15         A.      Nope.

16         Q.      When you were at Oceanside, did

17   you clock in?

18         A.      No.

19         Q.      Did you clock out?

20         A.      No.

21         Q.      At Riverhead, do you clock in?

22         A.      No.

23         Q.      Clock out?

24         A.      No.

25         Q.      At Oceanside, how often did you

Caruso Court Reporting, Inc.      (516) 695-3722

110

1                          A. Dunscomb

2    clean the bathrooms?

3            A.       Whenever needed.

4            Q.       Weekly?

5            A.       I don't know.  I don't know, I

6    just know whenever needed.  If I didn't have to

7    do it, I didn't do it.  If I had to do it, I did

8    it.  I can't tell you whether it was weekly.

9            Q.       Once a year?

10           A.       More than that, definitely more

11   than that.

12           Q.       Once a month?

13           A.       No, I guess once a week, I can't

14   -- I can't put a number on it.

15           Q.       At Riverhead, do you clean the

16   bathrooms?

17           A.       Once a week.

18           Q.       Do other assistant managers

19   clean the bathrooms at Riverhead?

20           A.       Yes.

21           Q.       How many bathrooms are there at

22   Riverhead?

23           A.       There's a ladies room and a

24   men's room.

25           Q.       Do the other assistant managers

111

1                          A. Dunscomb

2  also clean the bathrooms about once a week?

3        A.      Yeah, I would say that, yes.

4        Q.      Hopefully not the same day you

5  are doing it?

6        A.      No, what I mean by cleaning the

7  bathrooms, it's not I go in and clean the

8  bathroom, it's if I see the bathroom is in

9  dishevels, then yes, I'm going to go in and

10  clean the bathroom.

11        Q.      At Oceanside, did you see other

12  assistant managers cleaning the bathrooms?

13        A.      Yes.

14        Q.      Also once a week?

15              MR. BAUER:  Objection to form.

16        A.      I can't answer for them, I don't

17  know if they do it once a week.

18              MS. RUBIN:  I just want to take

19          a few minutes.  I'll be back.

20              (Recess taken.)

21              MS. RUBIN:  Back on the record.

22        Q.      Have you heard of Oracle?

23        A.      Yes.

24        Q.      What is Oracle?

25        A.      Oracle is a system that you

Caruso Court Reporting, Inc.     (516) 695-3722

112

1                         A. Dunscomb

2     place associates in when you first hire them

3     into the system so it marries into the other

4     systems to get them like their time and

5     attendance.  When you first hire someone, you

6     have to input all of their information that's

7     the main system that you enter.

8              Q.      Who has access to Oracle?

9              A.      The managers, store manager, and

10    associates have an Oracle that they can access

11    online for I guess their time, if they have

12    vacation time and they want to look into that.

13             Q.      Do you know if the district

14    manager has access to Oracle?

15             A.      Yes.

16             Q.      He does have access?

17             A.      Yes.

18             Q.      Or she?

19             A.      Yes.

20             Q.      If you had to terminate someone

21    for cause, would human resources need to be

22    involved?

23                     MR. BAUER:  Objection to form.

24             You can answer.

25             A.      No.

133

1                          A. Dunscomb

2    valentine's Day.  You know, if I was doing a,

3    um, I'm trying to think now of departments, like

4    AD; AD is the hard goods of the houseware end.

5    You know, you have baskets and little jewelry

6    boxes and stuff like that, everything that

7    pertains to Valentine's Day, I would create some

8    kind of story on the end cap that would entice a

9    customer to come to it and shop off of it.

10          Q.      And similar for Christmas?

11          A.      Similar for Christmas.

12          Q.      And for all the holidays you

13   would do that?

14          A.      For all the holidays I would do

15   that.

16          Q.      You also testified about, um,

17   cleaning in Oceanside and Riverhead, let me ask

18   you about Oceanside first.  In Oceanside, did

19   you have a position in that store known as a

20   maintenance associate?

21          A.      Yes.

22          Q.      Okay.  What was the role of the

23   maintenance associate?

24          A.      The maintenance associate was to

25   do the vacuuming of the carpets, cleaning of the

134

1                          A. Dunscomb

2     windows, the mirrors; if he was in at the time,

3     he would be the one to clean the bathrooms.

4     Just various duties; dusting of the racks, the

5     red valance around the store, make sure it's

6     dusted.  The appearance of the store, empty

7     trash.

8             Q.      Okay.  Continue, is there

9     anything else you can think of?

10            A.      Sometimes dust and sweep like

11    the floors.

12            Q.      Let me ask you this, again, I'm

13    talking about Oceanside right now?

14            A.      Right.

15            Q.      Was there also an outside

16    cleaning company that came in and cleaned?

17            A.      Yes.

18            Q.      How often?

19            A.      They came daily, but they only

20    worked -- they came in at 7 and left at 10.

21            Q.      What would they do?

22            A.      They would actually sweep and

23    damp mop and buff the floors and clean the

24    bathrooms.  Then they left.

25            Q.      They would clean the bathrooms

135

1                          A. Dunscomb

2     every day?

3              A.        Every day in the morning.

4              Q.        You said the maintenance

5     associate would also clean the bathrooms at

6     times?

7              A.        Yes, he would clean at times,

8     not always.  It wasn't his job to clean the

9     bathroom, he would do it if there was an issue.

10             Q.        But on a daily basis it was done

11    by a cleaning company?

12             A.        Yes.

13             Q.        Again, I'm talking about

14    Oceanside?

15             A.        Yes.

16             Q.        In terms of, I think you

17    testified you cleaned the bathrooms --

18             A.        Yes.

19             Q.        -- in Oceanside approximately

20    once a week?

21             A.        Yes.

22             Q.        Is this something that you

23    decided to do or were you told to do it?

24             A.        No, this is something I decided

25    to do.  I like a clean bathroom, and I live far

136

1                          A. Dunscomb

2    from my home not to go home and go to the

3    bathroom, so I would do it.  That took place

4    after the cleaning crew had gone for the day or

5    the maintenance guy.

6          Q.      I think you also said if there

7    was a spill or a break you would jump in in

8    those situations as well?

9          A.      That would be every associate

10   was able to do that.

11         Q.      Okay.  So if there --

12         A.      Yes, the managers as well.  I

13   mean, you don't walk past something that you --

14   you don't want somebody to get hurt.

15         Q.      For instance, if there was a

16   glass item broken on the floor?

17         A.      If you were by it, you would

18   hail an associate down, tell them if they could

19   go get a broom and mop while you watch the

20   breakage, and they would come back and you would

21   clean it up.  If the floor was wet, you would

22   leave the sign there so that an associate or a

23   customer wouldn't fall.

24         Q.      Let's switch over to Riverhead?

25         A.      Yes.

137

1                           A. Dunscomb

2          Q.      Does Riverhead also have a

3    maintenance associate?

4          A.      Yes.

5          Q.      How many?

6          A.      We have two.

7          Q.      Okay.  Does the maintenance

8    associate work every day?

9          A.      The maintenance associate -- the

10   first maintenance associate works from Monday to

11   Friday, the second maintenance associate works

12   on the weekends.

13         Q.      So there is a maintenance

14   associate there every day?

15         A.      Yes.

16         Q.      Are the responsibilities of the

17   Riverhead maintenance associate similar to the

18   responsibilities of the Oceanside maintenance

19   associate that you discussed just a few minutes

20   ago?

21         A.      Yes.

22         Q.      Is there also any cleaning

23   company that cleans the Riverhead store?

24         A.      Yes.

25         Q.      How often do they come in to

138

1                          A. Dunscomb

2    clean?

3           A.        They come in daily.

4           Q.        Do they do the same types of

5    cleaning that are done in the Oceanside store

6    that you testified to a few minutes ago?

7           A.        Yes.

8           Q.        Again, in Riverhead you

9    testified that you clean the bathroom out once a

10   week, correct?

11          A.        Yes.

12          Q.        Is that similar to what you

13   testified to in Oceanside, you do that because

14   you like a clean bathroom?

15          A.        Yes.

16          Q.        You also testified a little bit

17   about your role in the evaluation of associates,

18   correct?

19          A.        Yes.

20          Q.        Just so I understand it

21   correctly, the evaluations that you have done --

22   let's go back.  Did you do them when you were in

23   Oceanside?

24          A.        Yes.

25          Q.        And you do them in Riverhead?

139

1                    A. Dunscomb

2         A.      Yes.

3         Q.      What's your role in the process?

4         A.      In --

5         Q.      The evaluation of the

6    associates?

7         A.      In both stores?

8         Q.      If they are different, please

9    explain.

10        A.      They are not different.  Where

11   were we?

12        Q.      If it's the same --

13        A.      It's the same.

14        Q.      Okay.

15        A.      The store manager would probably

16   send me to give me people that I deal with, and

17   I would go back and pull their evaluation, read

18   it through and decide, you know, whether they

19   fit in the scale that they fit.  Evaluate them.

20   Then when it is time to give them their

21   evaluation, I would call them into the office

22   and we would sit down and discuss their

23   evaluation, go over it step by step and come up

24   with some kind of an action plan if there is a

25   problem we can fix, and go over it and give it a

146

1                         A. Dunscomb

2     coordinator in the Oceanside store?

3              A.      There was briefly, she was there

4     -- I was there -- she was there for two -- when

5     I got there, two years after that she left, then

6     they didn't replace that.

7              Q.      In the Riverhead store, does the

8     maintenance associate report to you as the

9     operations ASM?

10             A.      Yeah.

11                    MR. BAUER:  I have nothing

12            further right now.

13                    MS. RUBIN:  I have a few

14            follow-up.  Maybe more than a few.

15    FURTHER EXAMINATION BY

16    MS. RUBIN, ESQ.:

17             Q.      Does every employee at T.J. Maxx

18    get a walkie-talkie?

19             A.      No.

20             Q.      Who gets walkie-talkies?

21             A.      People on the sales floor, the

22    management, the coordinators, the backroom

23    coordinator, the cashiers.  I think that's it.

24             Q.      Did merchandise coordinators

25    have the ability to decide where they wanted

Caruso Court Reporting, Inc.      (516) 695-3722

147

```
1                        A. Dunscomb
2    certain merchandise to go?
3              A.      Yes.
4              Q.      Would you say that in Oceanside
5    the store manager is ultimately responsible for
6    how the store operates -- operated?
7              A.      No, we are all responsible for
8    that.
9              Q.      Do you work with other assistant
10   managers when putting together features and end
11   caps?
12             A.      Yes.
13             Q.      Do you work with the store
14   manager when putting together features and end
15   caps?
16             A.      Yes.
17             Q.      Do you have the authority to
18   give an associate a wage increase?
19             A.      I don't know.  I never had to do
20   that.
21             Q.      Do coordinators get a bonus?
22             A.      No.
23             Q.      Is there a background check for
24   new hires?
25             A.      There's a background check for
```

148

1                    A. Dunscomb

2    -- yes, it's, um, for, um, sensitive, like the

3    cash office.

4         Q.    If they fail that background

5    check, can you still hire them?

6         A.    No.

7         Q.    Do you report to the store

8    manager?

9         A.    Yes.

10        Q.    When you were at Oceanside, did

11   you report to the store manager?

12        A.    Yes.

13             MS. RUBIN:  I'm done.

14             MR. BAUER.  I think just one

15        question.

16   FURTHER EXAMINATION BY

17   MR. BAUER, ESQ.:

18        Q.    If a merchandise coordinator

19   sets something up that you as the merchandise

20   ASM didn't like, could you have him or her

21   change it?

22        A.    I would -- if it wasn't set up

23   properly I would bring her over to it and

24   discuss it with her and explain to her that, you

25   know, what was wrong, if it was wrong.  Then

149

1                           A. Dunscomb

2      yes, we would change it.

3                    MR. BAUER:  I have nothing

4               further.

5                    MS. RUBIN:  I'll just state for

6               the record that I confirmed that we are

7               splitting the cost of the deposition and

8               for all depositions going forward with

9               the exception of any additional things

10              being added to the deposition like real

11              time or additional copies, right?

12                   MR. BAUER:  Okay, well, so we

13              are splitting the cost --

14                   MS. RUBIN:  Yes.

15                   MR. BAUER:  -- okay and that gets

16              us a copy and the E-transcript?

17                   THE REPORTER:  You will receive

18              a hard copy in the mail and it will be

19              sent via E-Transcript.  Is that okay?

20                   MR. BAUER:  Yes, that's fine.

21                   (Whereupon, the within

22              examination was concluded at 6:35 p.m.)

23              *                    *                    *

24

25

150

1

2                A C K N O W L E D G E M E N T

3

STATE OF              )
4                           ) ss.:
COUNTY OF             )
5

6

7              I have read the foregoing record

of my testimony taken at the time and place
8
noted in the heading hereof and I do hereby
9
acknowledge it to be a true and correct
10
transcript of same.
11

12

13

                                    _____
14                                   ANGELINA DUNSCOMB

15

16

17

18   Subscribed and sworn to

19   before me this  _8th_  day

20   of _March_____, 2012.

21   _Pamela J. Dzikowski (Kennedy)_
              NOTARY PUBLIC
22
                          PAMELA J. DZIKOWSKI (Kennedy)
23                        NOTARY PUBLIC, State of New York
                          No. 01DZ4832300
24                        Qualified in Suffolk County
                          Commission Expires August 31, 2013

25

Caruso Court Reporting, Inc.      (516) 695-3722

Exhibit 4

1

2    UNITED STATES DISTRICT COURT                ORIGINAL

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------------------X

5    MOHAMMED M. AHMED,

6                              Plaintiff,

7         -against-                  10-CV-3609

8    T.J. MAXX CORP., and TJX COMPANIES, INC.,

9                              Defendants.

10   ------------------------------------------------X

11

12                        600 Old Country Road
                          Garden City, New York
13
                          February 13, 2012
14                        10:02 a.m.

15

16              DEPOSITION of JOSEPH PAPARATTO

17        pursuant Federal Rules and held before

18        Denise A. Caruso, a Notary Public of

19        the State of New York, at the

20        above-stated time and place.

21

22

23

24

25

        Caruso Court Reporting, Inc.     (516) 695-3722

2

1

2    A P P E A R A N C E S:

3

4

5    VALLI KANE AND VAGNINI, LLP

6         Attorneys for the Plaintiff

7         600 Old Country Road

8         Garden City, New York 11530

9    BY:    ROBERT VALLI, JR., ESQ.

10   BY:    DEBORAH RUBIN, ESQ.

11

12

13   LITTLER MENDELSON, P.C.

14        Attorneys for the Defendant

15        290 Broadhollow Road, Suite 305

16        Melville, New York 11747

17   BY:    JOHN T. BAUER, ESQ.

18   BY:    JUSTIN MARINO, ESQ.

19

20

21

22

23

24

25

Caruso Court Reporting, Inc.      (516) 695-3722

8

1                      J. Paparatto

2    contacted me and that I didn't have any

3    information on what was going on.

4         Q.      When you say no one contacted

5    you, you mean no one from T.J. Maxx?

6         A.      Right, no one other than from

7    your office.

8         Q.      Did anyone from my office tell

9    you that you couldn't speak with T.J. Maxx?

10        A.      No.

11        Q.      When they put you in --

12                MR. VALLI:  Withdrawn.

13        Q.      Do you know who you spoke with

14   at the T.J. Maxx corporate office?

15        A.      I think his name was Shaun.

16        Q.      Had you spoken with Shaun

17   before?

18        A.      No.

19        Q.      Do you know what Shaun's last

20   name is?

21        A.      Murphy I believe.

22        Q.      Where is the corporate office

23   located?

24        A.      We have a couple, I'm not sure

25   which one I contacted.

9

1                          J. Paparatto

2          Q.        Okay.  How did you get in touch

3    with Justin, did you call him or did he call

4    you?

5          A.        I believe Shaun had called me

6    and let me know that Justin was going to come

7    see me, and then I met Justin face-to-face.

8          Q.        Was it the first time you had

9    spoken to him, Justin that is?

10         A.        I believe so, there might have

11   been in between calls saying I'm on my way, but

12   no, that was it.

13         Q.        I understand.

14                   Where did he come see you?

15         A.        At my store.

16         Q.        Where is your store?

17         A.        That would be Wilton,

18   Connecticut.

19         Q.        What is your position at that

20   store?

21         A.        I'm the operations manager.

22         Q.        How long have you been the

23   operations manager at the Wilton, Connecticut

24   store?

25         A.        Since October of 2010, I

10

1                        J. Paparatto

2    believe.

3         Q.        Where did you meet with Justin?

4         A.        In my -- in the manager's

5    office.

6         Q.        When you say you are an

7    operations manager, that's an assistant manager

8    position?

9         A.        Yes, correct.

10        Q.        Do the assistant managers have

11   their own office?

12        A.        Not in this particular store.

13        Q.        Can you recall, in sum and

14   substance, the conversation you had with Justin?

15        A.        He asked me about what I do for

16   T.J. Maxx, what my work experiences are.

17        Q.        Did he ask about your

18   conversations with my firm?

19        A.        Yes.

20        Q.        What did you tell him?

21        A.        I had told him that I had spoken

22   with your firm and that we had some dialogue

23   back and forth.

24        Q.        Did you tell him anything

25   specific about that dialogue back and forth?

36

1                    J. Paparatto

2          A.      In certain stores.

3                  MR. BAUER:  Objection as to

4          form.

5          Q.      Are there any other ASM titles

6     that you are aware of?

7          A.      Not that I know of, but they

8     keep popping up.  The customer service manager

9     is new, I hadn't heard of that one recently, the

10    more volume you have, and T.J. Maxx is growing

11    rather quickly, the more titles seem to, you

12    know, pop in there.

13         Q.      Have you been a plaintiff in a

14    lawsuit?

15         A.      No.

16         Q.      Ever a defendant in a lawsuit?

17         A.      No.

18         Q.      Other than testifying for

19    Toys"R"Us, ever a witness in a lawsuit?

20         A.      No.

21         Q.      Can you tell me, when you

22    started in March of 2000, what were your duties

23    as a merchandising ASM?

24         A.      Making sure that the merchandise

25    was out on the sales floor, what we call our

Caruso Court Reporting, Inc.     (516) 695-3722

37

1                    J. Paparatto

2    features, kind of displays, make sure the

3    features were full.  I was in charge of quite a

4    few employees, so got to make sure they were

5    doing all of those things.  As a merchandiser,

6    my job is to make sure the store is full and

7    packed full, the merchandise is out on the sales

8    floor or within company guidelines.

9          Q.      Where were you I guess working

10   location-wise when you first came back to T.J.

11   Maxx?

12         A.      First came back the second time?

13         Q.      We are going to stay with the

14   second time.

15         A.      East Haven, Connecticut.

16         Q.      Who was your store manager?

17         A.      I do not recall her name.

18         Q.      Okay.  Did you have any

19   assistant managers at the East Haven store?

20         A.      Yes.

21         Q.      Do you recall their names?

22         A.      People come and go so quickly.

23   At that time, Brian, I'm not sure what his last

24   name was.

25         Q.      Okay.  Do you know if Brian is

Caruso Court Reporting, Inc.      (516) 695-3722

38

1                          J. Paparatto

2    still employed with T.J. Maxx?

3            A.       No, he is not.

4            Q.       Do you know where he's employed?

5            A.       The last I heard he was with

6    Kohl's.

7            Q.       Did there come a time when you

8    left the East Haven, Connecticut store?

9            A.       Yes.

10           Q.       Where did you go?

11           A.       I've been transferred many times

12   in T.J. Maxx.  I believe the next store was East

13   Haven -- I mean North Haven, my apologies.

14           Q.       John has asked for you to have

15   the ability to read and review.  If there's

16   obviously a change, whether it's minor or not,

17   you will have an opportunity.  So if there is a

18   mistake, you know what, this should really read

19   this, it's called an errata sheet.

20           A.       In the last seven years -- that

21   first seven years that I was with T.J. Maxx,

22   they put me from store to store to store, many

23   stores twice, so it gets a little blurry of what

24   was first, what was second and what was third.

25           Q.       Let's go backwards and get as

Caruso Court Reporting, Inc.       (516) 695-3722

39

J. Paparatto

1

2    far into the past as we can to see if that is

3    more pertinent for the case.

4                    You are currently at the Wilton

5    store?

6         A.      Right.

7         Q.      You are an operations ASM at the

8    Wilton store?

9         A.      Yes.

10        Q.      Did you say from March of 2010?

11        A.      No, October.

12        Q.      October, right.  Okay.  Where

13   were you working prior to the Wilton store?

14        A.      Newtown, Connecticut.

15        Q.      What was your title there?

16        A.      Merchandise manager.

17        Q.      How long were you there for?

18        A.      Only a couple of months, I

19   believe I got there July, July 4 of 2010, and I

20   was only there to November -- October.

21        Q.      Is there a reason you were moved

22   out of the Newtown, Connecticut store within a

23   few months, that you are aware of?

24                    MR. BAUER:  Objection as to

25        form.

40

1                    J. Paparatto

2          A.      Yes, I was, prior to that, I was

3    working on Long Island, and the company had

4    helped me get from Long Island to Connecticut,

5    and that was the store they put me in as a

6    holding point until they found a better position

7    for me, where Newtown really didn't need me.

8          Q.      Can we say it's an interim

9    position then, pending your permanent

10   appointment in a Connecticut store?

11                 MR. BAUER:  Objection as to

12         form.

13         A.      You can say that.

14         Q.      Why did you want to move from a

15   Long Island store to a Connecticut store?

16         A.      I had actually lived in

17   Connecticut and my house was still there.

18         Q.      So prior to working in the

19   Newtown store, you worked in a Long Island

20   store?

21         A.      Yes.

22         Q.      Where was that?

23         A.      Massapequa.

24         Q.      What was your title in the

25   Massapequa store?

41

1                    J. Paparatto

2        A.       Merchandise manager.

3        Q.       How long were you there for?

4        A.       Just a couple of months.  I want

5  to say May to July.

6        Q.       Any reason that you are aware of

7  why you were in the Massapequa store for only a

8  couple of months?

9                 MR. BAUER:  Objection as to

10         form.

11        A.       Yes.

12        Q.       Why?

13        A.       At that point, they knew I was

14  transferring back to Connecticut, so they filled

15  my position in the Commack store and moved me

16  temporarily to Massapequa until there was an

17  opening in Connecticut.

18        Q.       So prior to working in

19  Massapequa, you were in the Commack store?

20        A.       Yes.

21        Q.       What was your title in the

22  Commack store?

23        A.       Operations manager.

24        Q.       How long were you working in the

25  Commack store?

Caruso Court Reporting, Inc.     (516) 695-3722

53

1                              J. Paparatto

2         A.        No.  A key holder can grab an

3    application and look at it and certainly give

4    their opinion on it, but it's just a manager or

5    store manager that's going to really review the

6    application and go from there.

7         Q.        What are the steps that are

8    required then in hiring someone now that you

9    have gotten the application?

10        A.        Once you get the application?

11        Q.        Yes, sir.

12        A.        Review it, if they look like

13   somebody that you would like to talk to, if

14   their qualifications are okay.  I usually look

15   at salary, you know, what kind of salary range

16   they are looking at, if they had past experience

17   in retail, if it's their first job.  If they are

18   overqualified, why are you looking for a minimum

19   wage position, education.

20                  How well the application is

21   filled out, is it filled out completely.  Are

22   there gaps in employment, are there gaps in

23   general.  Are there questions not answered and

24   skipped over.  Is the application signed, are

25   they signing if they are supposed to or where it

54

1                    J. Paparatto

2    says sign here.

3                    If you live in Connecticut and

4    they are filling out a New York application.  As

5    far as their references, do their references

6    match up with who they say they worked for.

7          Q.      In terms of minimum wage

8    position I guess, what authority do you have to

9    hire above minimum wage?

10                  MR. BAUER:  Objection as to

11         form.

12         A.      It depends on the store.

13         Q.      Let's go with a store -- have

14   you worked in stores where you have not had the

15   authority to hire above minimum wage?

16         A.      Yes.

17         Q.      Do you recall what stores?

18         A.      It's a general question, our

19   base for hiring is minimum wage.  In specific

20   stores, if I wanted to hire someone over minimum

21   wage, I'm sure I can do that with getting

22   authorization.  But I believe you are asking do

23   I have the ability to change that on my own?

24         Q.      When you say get authorization,

25   would that be from the store manager or someone

55

1                          J. Paparatto

2      else?

3                          MR. BAUER:  Objection as to

4              form.

5              A.      Again, it depends on the store,

6      some stores I can ask the store manager if they

7      have that leeway, other times I have to go

8      through the district manager.

9              Q.      Is there a chain of command

10     within the stores in terms of speaking with the

11     district manager?

12                         MR. BAUER:  Objection as to

13             form.

14             A.      Yes, um, we call it open door,

15     we actually have a name for it.  You really

16     would like to go through the chain, but you

17     don't have to go through the chain.  That's the

18     whole purpose of open door, you feel free to

19     talk to whoever you want.

20             Q.      If the store manager is present

21     in the store, preferably you go through them

22     first?

23             A.      Preferably, yes.

24                         MR. BAUER:  Objection as to

25             form.

Caruso Court Reporting, Inc.       (516) 695-3722

82

1                    J. Paparatto

2                    When the store manager creates

3      the schedule, do they create it for a week, two

4      weeks, three weeks?

5                    MR. BAUER:  Objection as to

6           form.

7           A.      In my particular store, it's

8      three months in advance.

9           Q.      Three months in advance?

10          A.      Yes.

11          Q.      If you wanted to alter the

12     schedule, do you have to talk to the store

13     manager?

14          A.      Yes.  Wait, the management

15     schedule?

16          Q.      The management schedule, yes.

17                  How is the hourly employees'

18     schedule created?

19          A.      Depending on the store --

20          Q.      The store you are currently in?

21          A.      The computer will come up with

22     a -- I don't want to say a generic schedule, but

23     a basic schedule, and then myself or the store

24     manager will tweak it.

25          Q.      When you say tweak the schedule,

83

J. Paparatto

1  what would you do to the schedule to tweak it?

2       A.       Make sure that there are no
3  spaces.  The computer is not fail proof, so, you
4  know, it may leave you an area not covered that
5  specifically needs a person there.

6       Q.       GIGO, garbage in and garbage
7  out?

8       A.       Yes.

9       Q.       Do you know if the scheduling
10 computer -- it's called Kronos?

11      A.       Yes.

12      Q.       Does someone enter in the
13 available times of the associates so the
14 computer knows, for instance, I can't schedule,
15 you know, John for Tuesday and Thursdays because
16 he's in school, is that built into the system?

17              MR. BAUER:  Objection as to
18          form.

19      A.       Yes, that information has to be
20 input.  It doesn't work unless it knows what the
21 availability of each associate is.

22      Q.       What, if any, role do you play
23 in setting the hours of the store that it's
24 open?

84

J. Paparatto

MR. BAUER:  Objection as to

form.

A.      The store hours?

Q.      Yes.

A.      None, that's company directed.

Q.      Has that been in every store

that you worked in?

A.      Yes.

Q.      In terms of the non-customer

hours now, the opening and closing times, what,

if any, role do you have in the setting of those

times?

MR. BAUER:  Objection as to

form.

A.      There's two parts to that

question.  As far as the company sets a specific

time where you have to be there on those

non-customer hours.  If we feel we need more

time to do a specific project, I can certainly

make that decision or another member of

management or the store manager.

Q.      In terms of associate hours, are

associates permitted to work overtime?

A.      They are permitted to work

Caruso Court Reporting, Inc.      (516) 695-3722

102

1                    J. Paparatto

2           reasonable.  If you have speaking

3           objections, I normally don't accept

4           them.

5                    MR. BAUER:  It sounded the way

6           it was speaking when he said they he was

7           referring to the register.

8           Q.       I'm thinking the whole register

9    drawer comes out and the whole drawer goes into

10   a canvas bag?  I am incorrect?

11          A.       You are not correct.  Let me

12   clarify; I do not lift the register up and put

13   it in the bag.

14          Q.       I worked at places and the whole

15   drawer comes out and the drawer slides into a

16   slot in a safe.

17          A.       The drawer does come out, and

18   the drawer opens, and there is an individual

19   drawer that pops out, that stays on the counter.

20   The money that is in that drawer gets collected,

21   put into a small canvas bag and the canvas bag

22   is brought to the safe.

23          Q.       Okay.  Does anyone count that

24   money out?

25          A.       No -- well, the following

103

1                          J. Paparatto

2     morning it gets counted.

3              Q.      Is there an opening procedure

4     regarding counting the money in those canvas

5     bags?

6              A.      Yes.

7              Q.      Who does that?

8              A.      The administrative coordinator

9     or the money counter, since the position is

10    disappearing, money counter person.

11             Q.      Is there a second person, a

12    witness, who does that with them?

13             A.      No, there is a camera on them

14    24/7.

15             Q.      They must count the money at a

16    certain location in the store?

17             A.      In a cash office.

18             Q.      Your current store, does it have

19    a contract cleaning company?

20             A.      Yes.

21             Q.      Are there any cleaning

22    responsibilities for T.J. Maxx employees?

23             A.      Yes.

24             Q.      What are those responsibilities?

25             A.      Vacuum the carpets in the

104

1                           J. Paparatto

2    morning, wipe down the windows, dust the place.

3    All the fixtures get dusted, any areas that are

4    exposed.  Canopies that run around the edge of

5    the store, the fitting rooms, any surface that

6    can collect dust.  That's the maintenance man's

7    job, cleaning.

8            Q.      So there's a maintenance person

9    that does that?

10           A.      Oh, yeah, he's a nice guy.

11           Q.      He's assigned to your store?

12           A.      Yes.

13           Q.      I'm sorry, you are currently the

14   operations manager in your store?

15           A.      Yes.

16           Q.      Who is the merchandise manager?

17           A.      Irene, she just got there, I'm

18   not sure of her last name.

19           Q.      Do you know if she's salaried?

20           A.      Yes, she's salaried.

21           Q.      Since you have been an ASM at

22   T.J. Maxx, have you gone on any training

23   seminars or training junkets?

24                   MR. BAUER:  Objection as to

25           form.

Caruso Court Reporting, Inc.      (516) 695-3722

105

1                      J. Paparatto

2          A.       Yes.

3          Q.       Where have you gone for

4    training?

5          A.       Where have I gone for training?

6          Q.       Yes.

7          A.       New Jersey.

8          Q.       I wasn't thinking it was

9    something special, I was just asking.

10         A.       Okay.

11         Q.       Was it a store?

12         A.       No, sometimes it's a hotel,

13   sometimes it's a corporate office.

14         Q.       I want to differentiate between

15   training you are now receiving as an ASM and

16   training you received when you became an ASM, do

17   you understand the difference?

18         A.       Yes.

19         Q.       Did you receive generalized

20   training to become an ASM at T.J. Maxx?

21         A.       Yes.

22         Q.       When was that?

23         A.       I went through it twice because

24   I left and came back.   The most recent would

25   have been in November 2008.

106

1                      J. Paparatto

2          Q.       Was the training similar to what

3    you had gone through when you first came to T.J.

4    Maxx?

5                    MR. BAUER:  Objection as to

6          form.

7          A.       Similar, there are some new

8    things that had gone on the year I was not with

9    T.J. Maxx, and it wasn't as formal -- I can't

10   say it wasn't as formal, it wasn't as much.  I

11   spent seven years with the company, I didn't

12   need everything all over again.

13         Q.       Where did that take place?

14         A.       Several different stores, I

15   learned Kronos.  And I don't remember the name

16   of the store, if I had a store listing I could

17   tell you, it was out here on Long Island.

18         Q.       It was all in stores, though?

19         A.       Yes, they had specific trainers

20   for specific parts.  I did some training in

21   Carle Place, some in, I'm not sure if it was

22   Kings Park or Islandia, I always get those two

23   stores confused.  And one of the stores is close

24   to an airport, I don't remember which one it

25   was.  That was my Kronos training.

107

1                       J. Paparatto

2          Q.       Approximately how many other

3    persons were taking the training when you took

4    the training in November of 2008?

5          A.       I was individualized, so it was

6    me.

7          Q.       Just you?

8          A.       Yes.

9          Q.       Did you receive any training

10   manuals at the time?

11         A.       Parts of training manuals, but

12   not actual training manual.  My first time with

13   T.J. Maxx I got the training manual.  The second

14   time back I only got the pieces that I really

15   needed.

16         Q.       Are there such things as

17   training stores that you are aware of at T.J.

18   Maxx?

19         A.       Yeah, um, it depends on the

20   district.

21         Q.       I guess explain the difference?

22         A.       I'm saying it like that because

23   I haven't heard the term, they do come and go,

24   there are specific stores that are training

25   stores that you will go to.  I haven't heard it

Caruso Court Reporting, Inc.     (516) 695-3722

108

1                    J. Paparatto

2    in a while so I'm not sure it still exists.

3          Q.      During your tenure at T.J. Maxx,

4    have you ever been sent to a different store for

5    a short period of time to help out?

6          A.      Yes.

7          Q.      In what circumstances?

8          A.      Um, help a store do inventory,

9    help prepare stores for inventories, help

10   re-fixture, redo stores.

11         Q.      When you have to help a store to

12   prepare or do their inventory, what do you do?

13         A.      In the case of me doing

14   inventory, I was actually the counter -- let me

15   rephrase.  I actually did inventories in the

16   stores.

17         Q.      So you are counting each

18   article?

19         A.      Yes, I was part of the inventory

20   crew.

21         Q.      Is there more than one counter?

22         A.      Yeah.

23         Q.      I was getting scared.

24         A.      Yes, there are a lot of

25   counters, but we had a specific core group of

109

1                          J. Paparatto

2    counters as well as the -- those individuals in

3    the store.  Each store would count their own

4    inventory.  Again, depending on the store, some

5    stores have a company that comes in.  Most T.J.

6    Maxx -- we do our own inventory, we have our own

7    guns.  Out here on Long Island, we had a

8    specific crew, management team that would go

9    along and help out whatever store was having

10   inventory.

11          Q.      Are there two counts of

12   inventory, one done by either the company or

13   the -- the outside company or the store

14   employees and the second one done by this

15   management crew?

16                  MR. BAUER:  Objection as to

17          form.

18          A.      Either one or the other.

19          Q.      Is there a cross-check to say we

20   counted X and you counted Y?

21          A.      No, there's one inventory.

22          Q.      How many members of management

23   were on this crew?

24                  MR. BAUER:  Objection as to

25          form.

Caruso Court Reporting, Inc.     (516) 695-3722

110

1                          J. Paparatto

2          A.      Yes.

3                  MR. VALLI:  I'll withdraw.

4          Q.      This management crew that went

5     around counting, who were the members?

6          A.      I'm not sure, I only know me.

7          Q.      How many people?

8          A.      Maybe five to eight.

9          Q.      All ASMs?

10                 MR. BAUER:  Objection as to

11         form.

12         A.      I'm not sure, there might have

13    been a manager or two in there.  Certainly the

14    manager from each store would be present, of

15    course.  I'm not sure if there was a traveling

16    manager or if it was all ASMs.

17         Q.      How did it come to be that you

18    were part of this counting team?

19         A.      They liked me, I don't know.  I

20    didn't volunteer, they said you are on the

21    committee, all right.

22         Q.      How many stores did you end up

23    counting inventory for as part of this --

24         A.      Four to five.

25         Q.      Four to five?

111

1                           J. Paparatto

2              A.      Yes.

3              Q.      I think we asked this, but I

4    wasn't sure, in your current store, there is not

5    an ASM office, correct?

6                      MR. BAUER:   Objection as to

7              form.

8              A.      Correct, it's a combined office.

9              Q.      With the store manager?

10             A.      Yes.

11             Q.      In other stores, the ASMs had

12   their own office?

13             A.      Yes.

14             Q.      Which stores were that?

15             A.      I couldn't tell you if I tried.

16   They all look the same, I leave one store, I go

17   to the next, don't look back.

18             Q.      Do you have an e-mail address at

19   T.J. Maxx?

20             A.      There's an assistant store

21   manager e-mail address.

22             Q.      It's one you share with other

23   ASMs?

24             A.      Yes.

25             Q.      Just for that store?

112

J. Paparatto

2 A. Just for that store.

3 Q. Do you share that with any other

4 employees aside from assistant store managers?

5 A. No.

6 Q. Does the key holder have an

7 e-mail address?

8 A. Yes.

9 Q. How many key holders are in your

10 store currently?

11 A. Two.

12 Q. Do they share that e-mail

13 address?

14 A. Yes, they share their e-mail

15 address.

16 Q. Yes?

17 A. Yes.

18 Q. Do you have access to their

19 e-mail?

20 A. No, I know what their -- there's

21 individual e-mail addresses, like there's a

22 password and an actual, whatever it's called --

23 I don't know.

24 Q. E-mail address?

25 A. No, no.

113

J. Paparatto

1

2      Q.      User name?

3      A.      User name.  I know their user

4  name, it's the same in all the stores, same as

5  the store manager and the assistant store

6  manager, they don't change.

7      Q.      So the user name won't change,

8  but the password may?

9      A.      It will, they are not the same.

10  It's only the beginning part that is the same,

11  but the store number will change at the end.

12  But as far as having access to their specific

13  e-mail, anything that goes to them will come to

14  me automatically.

15      Q.      Are there a set number of hours

16  that you are required to work each week?

17      A.      Yes.

18      Q.      What is that?

19      A.      I'm required to be there for ten

20  hours, but I get an hour break.

21      Q.      Five days or six days a week?

22      A.      Five days.

23      Q.      So fifty hours minus one hour

24  per day for a break?

25      A.      Correct.

114

1                    J. Paparatto

2          Q.       When you take your break, is it

3     a working break?

4          A.       Yes.

5          Q.       You eat on the go?

6          A.       Yes.

7                   MR. BAUER:  Objection as to

8          form.

9          Q.       What phrase would you use, I

10    call it eating at my desk?

11         A.       It's all the same, eating at my

12    desk, eat while I'm working.

13         Q.       Is there a rule about eating in

14    front of customers though?

15                  MR. BAUER:  Objection as to

16         form.

17         A.       Yes, you don't eat in front of

18    the customers.

19         Q.       I know that.

20         A.       Okay.

21         Q.       The five days a week that you

22    work can be any five days, Monday through

23    Sunday?

24                  MR. BAUER:  Objection as to

25         form.

Caruso Court Reporting, Inc.    (516) 695-3722

115

1                    J. Paparatto

2          Q.       Or Sunday through Saturday,

3    however you want to say it?

4                    MR. BAUER:   Objection as to

5          form.

6          A.       Yes.

7          Q.       Have you ever complained about

8    the number of hours you are working at T.J.

9    Maxx?

10                   MR. BAUER:   Objection as to

11         form.

12         A.       To a supervisor?

13         Q.       Yes.

14         A.       No.

15         Q.       Have you heard of other ASMs

16   complaining about the number of hours they have

17   had to work?

18                   MR. BAUER:   Objection as to

19         form.

20         A.       In groups or to specific

21   supervisors?

22         Q.       We'll start with specific

23   supervisors?

24         A.       No.

25         Q.       In groups?

122

1                         J. Paparatto

2      that?

3              A.      I can volunteer somebody, but

4      no, I would not have involvement with that.

5              Q.      Okay.

6              A.      Let me rephrase that.  I have

7      interviewed candidates for assistant store

8      manager to give my opinions on them.

9              Q.      Sure.

10             A.      Yes.

11             Q.      How many hours a week do you

12     estimate that you spend on interviewing?

13             A.      It depends on the time.  Where,

14     around the holidays, we are interviewing quite a

15     bit, I'll spend a good portion of my day

16     interviewing.  Now, where I just finished

17     letting people go, it's not a big part of my

18     day.

19             Q.      Can you go an entire week

20     without interviewing?

21                     MR. BAUER:  Objection as to

22             form.

23             A.      Yes.

24             Q.      So you can go an entire week

25     without hiring anyone?

123

```
1                    J. Paparatto
2                    MR. BAUER:  Objection as to
3         form.
4         A.      Yes.
5         Q.      With respect to discipline, is
6    there something called an e-form?
7         A.      There's a form for discipline,
8    I'm not sure if it's an e-form.
9         Q.      Is it a hard copy or is it done
10   on the computer?
11        A.      It's done on the computer, but
12   it's not done under e-form.  It's done under
13   Oracle.
14        Q.      Oracle?
15        A.      Oracle is the program.
16        Q.      In your current store, do you
17   ever ring the registers?
18                    MR. BAUER:  Objection as to
19        form.
20        A.      Very, very rare.  They don't
21   want to see a member of management on the
22   register whatsoever.
23        Q.      When you say, "they," who is
24   they?
25        A.      District manager, store manager.
```

Caruso Court Reporting, Inc.      (516) 695-3722

124

1                         J. Paparatto

2    It's shunned.  I'll take a customer on a very

3    rare occasion if there is a line building up or

4    if there is a distraught customer, I'll take

5    them personally, but that is the exception.

6           Q.      Okay.  In terms of your

7    employment, do you receive performance reviews?

8           A.      Yes.

9           Q.      How often is that done,

10   generally?

11          A.      Twice a year.

12          Q.      Who performs your performance

13   appraisal?

14          A.      My store manager will give me

15   mine.

16          Q.      Do you perform performance

17   appraisals as an ASM?

18          A.      Yes.

19          Q.      Who do you appraise?

20          A.      Anybody under me.  Any of my

21   subordinates.

22          Q.      So anyone from a key holder down

23   to associate?

24          A.      Correct.

25          Q.      Does the store manager --

128

1                    J. Paparatto

2          A.      The same person that does the

3    paper copy, the hard copy, or put it in the

4    computer.

5          Q.      If it's your week, you put it on

6    the clipboard --

7          A.      And you are responsible for it.

8          Q.      And you transmit it?

9          A.      Correct?

10          Q.      Do you know where you transmit

11    it to?

12          A.      Somewhere in corporate.

13          Q.      Has anyone from corporate ever

14    spoken to you about checklists that you have

15    filled out?

16          A.      No.

17                  MR. BAUER:  Objection as to

18          form.

19          Q.      In terms of hourly associates

20    who are making minimum wage, is there a

21    procedure to increase their hourly rate of pay?

22          A.      There's two procedures that can

23    be done to increase their pay.  Most of the time

24    it's based on their annual review, and there's

25    times where they can receive a merit increase.

Caruso Court Reporting, Inc.      (516) 695-3722

129

1                    J. Paparatto

2          Q.        A merit increase?

3          A.        Correct.

4          Q.        Who has the authority in the

5    store to award an associate a merit increase?

6          A.        I believe the bottom line has to

7    be approved by the district manager, but the

8    store manager can go to the district manager, or

9    I can go to the district manager, I believe they

10   have to approve it.

11         Q.        When you say, "bottom line,"

12   there's an actual form that has to be filled

13   out?

14         A.        Yes, they have to fill it out.

15         Q.        When you say, "they," who is

16   they?

17         A.        The district manager has to fill

18   out that form.

19         Q.        Have you heard of the phrase a

20   smart payroll report or a smart report?

21         A.        Yeah.

22         Q.        What is a smart report?

23         A.        There's a report that comes out,

24   I'm not sure if it's monthly or weekly, it's

25   broken down weekly.  It tells you what amount of

130

1                         J. Paparatto

2    hours you can have in each area of the store.

3    They call them payroll budgets.  Depending on

4    what budget you are looking at, if you are

5    looking at the cashiers, it tells you how many

6    hours your store should use for cashiering, how

7    many hours for the backroom and how many hours

8    for the sales floor.

9              Q.      This is a report that comes

10   out --

11                     MR. VALLI:  Withdrawn.

12             Q.      Is this a report that comes out

13   before you make the schedule?

14                     MR. BAUER:  Objection as to

15             form.

16             Q.      Before the schedule is made by

17   Kronos?

18                     MR. BAUER:  Objection as to

19             form.

20             A       Yes, it gives you the full month

21   on it.  I would assume it's monthly, even though

22   you have all the weeks on there, and it

23   corresponds to what Kronos produces.  You can

24   take that report and go into Kronos and they

25   will match up.

131

1                      J. Paparatto

2           Q.      I guess my question is, it is

3    not a post-schedule report criticizing the prior

4    schedule?

5           A.      No, no, it tells you what you

6    have to use, and that is what Kronos is basing

7    its production off of.

8           Q.      What, if any, involvement do you

9    have in the creation of the smart payroll

10   report?

11                  MR. BAUER:  Objection as to

12          form.

13          A.      You have -- I'm not sure what

14   the timeline is, it's a couple of months.  Those

15   are made a couple of months in advance.  If I

16   feel there's an issue, like my backroom is not

17   getting enough time or whatever, I can call up

18   and say what can you do for me, I have a

19   problem, and they will either say, okay, I agree

20   with you, but it will take eight weeks or so to

21   produce that change.  It is not instantaneously,

22   unfortunately.

23          Q.      Is that something you have to

24   discuss with the store manager?

25                  MR. BAUER:  Objection as to

            Caruso Court Reporting, Inc.      (516) 695-3722

132

1                    J. Paparatto

2          form.

3          A.      I don't have to, but I probably

4     would, but certainly don't have to, I can just

5     pick up the phone and do that.

6          Q.      Is the fact that you need more

7     help in the backroom something you would have

8     previously discussed with a store manager?

9                  MR. BAUER:  Objection as to

10         form.

11         A.      I would imagine.  Again,

12    everything we do is discussed together as a

13    group.

14         Q.      Okay.  In terms of the, I guess

15    they are called budgets, area budgets or

16    department budgets?

17         A.      Payroll budgets.

18         Q.      In terms of the payroll

19    budget --

20         A.      Yes.

21         Q.      -- do you know if it changes

22    from week to week?

23                 MR. BAUER:  Objection as to

24         form.

25         A.      Yeah, the form will stay the

138

1                    J. Paparatto

2                    MR. BAUER:   Objection as to

3          form.

4          A.      I don't know how many walks she

5    does with the other stores.  I would imagine I'm

6    getting my share.

7          Q.      When you say you are in the

8    district store, can you explain what you mean by

9    that?

10         A.      Each district manager has a

11   specific store that they work out of.  In this

12   case, my district manager runs her business out

13   of my store.

14         Q.      Do you know how often the

15   district manager is in your store on a weekly

16   basis?

17         A.      At least once a week, every

18   Monday.

19         Q.      Every Monday?

20         A.      I'll stay away from universals.

21   On the whole, Mondays.

22         Q.      It's okay.  I understand.

23                 Does management, store

24   management now, at your store, hold store

25   meetings?

Caruso Court Reporting, Inc.       (516) 695-3722

139

J. Paparatto

1

2     A.     Yes.

3     Q.     How often?

4     A.     It depends, it's not a set.

5     Q.     It's not a set time?

6     A.     No.

7     Q.     Okay.

8     A.     I'm a meetings guy, I like to
9 hold what we call huddles.  Believe it or not,
10 I'm pretty talkative.  I'll get my group
11 together, usually in the mornings when I can.
12 Is it every morning, absolutely not.  Whenever I
13 feel the need to give an upbeat meeting, I'll
14 grab everybody and start yapping and telling
15 them what is going on in the store.  There is a
16 required two store meetings per year.

17     Q.     That's per year?

18     A.     Yes, per year, a big store
19 meeting where you try to get everybody all
20 together at once.

21     Q.     Okay.  Are there any management
22 meetings that are held?

23     A.     Yes.

24     Q.     How often are those held?

25     A.     Usually on Mondays.

140

1                    J. Paparatto

2          Q.      Is the DM present for these

3    meetings?

4          A.      In a way.  Not at the physical

5    meeting.  You usually have a phone call with the

6    DM first with all members of -- I can't say all

7    members of management -- with at least the store

8    managers, sometimes assistants will take the

9    phone call.  I happen to be on all of them so I

10   can only go by myself.  But when we have our

11   store meetings, no, the district manager is not

12   present.

13         Q.      Are there any DM meetings

14   involving other stores, that you participate in?

15              MR. BAUER:  Objection as to

16         form.

17         A.      Yes, my DM likes to have

18   meetings, so I participate in a few.  She is a

19   new DM herself.

20         Q.      How many stores are in your

21   district?

22         A.      Nine I think.

23         Q.      Nine?

24         A.      I think.  I would have to count

25   them out.  Near nine.  Maybe I'm pushing her a

Caruso Court Reporting, Inc.      (516) 695-3722

141

1                    J. Paparatto

2    little bit, maybe seven.

3            Q.      Is there a dress code at T.J.

4    Maxx?

5            A.      Yes.

6            Q.      What is the dress code?

7            A.      I would have to look at the

8    sheet specifically, but there's -- it's part of

9    the new hire packet what the dress code is;

10   specifically no blue jeans, no shorts, no

11   T-shirts with logos on them.  Off the top of my

12   head.

13           Q.      Is this the dress code that's

14   been in existence since you have been a T.J.

15   Maxx employee?

16                   MR. BAUER:  Objection as to

17           form.

18           A.      Yes.

19           Q.      It's -- it's been applicable in

20   each of the stores that you have worked in, yes?

21                   MR. BAUER:  Objection as to

22           form.

23           A.      Yes.

24           Q.      Have you ever tried to alter the

25   dress code?

Caruso Court Reporting, Inc.      (516) 695-3722

145

J. Paparatto

1   them.   We'll do something every once in a while,

2   get so many credit cards and we'll buy you

3   lunch.   If I see you doing something above and

4   beyond, besides the brilliant card, you know,

5   maybe we'll give them a couple of reach cards or

6   something like that.

7   We are doing something specific

8   now with the bulletin boards, we are handing out

9   bulletin boards for the associate to take care

10  of and the winner will get a prize.

11  Q.      The employees that receive, I

12  guess, associate of the quarter?

13  A.      Yes.

14  Q.      Are they entered then into a

15  national program?

16  A.      Not that I'm aware of.  They do

17  receive a certificate from one of their regional

18  vice presidents with their name on it, and they

19  receive a fifty dollar gift card.  I don't

20  believe they receive a plaque.  They had their

21  name up on a plaque on the wall, I think they

22  got rid of that.

23  Q.      It's a gift card to T.J. Maxx?

24  A.      Yes.

146

1                      J. Paparatto

2                      MR. BAUER:  Can we take a break

3          if this is a good time for you?

4                      MR. VALLI:  Sure.

5                      (Recess was taken from 12:52 to

6          1:05 p.m.)

7                      MR. VALLI:  Back on the record.

8          Q.      In terms of the hours you work,

9   per week?

10         A.      Right.

11         Q.      I know you said five days of ten

12  with a break, do you actually work more than

13  that, though?

14                     MR. BAUER:  Objection as to

15         form.

16         A.      On occasion, yes.

17         Q.      Are you ever scheduled for more

18  than five days a week?

19         A.      Physically scheduled?

20         Q.      Yes.

21         A.      Around the holidays there are

22  specific times where we are put on six days.

23         Q.      That's a ten-hour day as well?

24         A.      Yes.

25         Q.      Six ten-hour days?

147

J. Paparatto

2          A.          Yes.

3                      MR. BAUER:   Objection as to

4          form.

5          Q.          For how many weeks are you

6    normally scheduled for six ten-hour days?

7                      MR. BAUER:   Objection as to

8          form.

9          A.          I believe it's two additional

10   weeks -- two weeks.

11         Q.          And you --

12         A.          They are not consecutive, it

13   would be one week then another.

14         Q.          Do you ever work more than ten

15   hours in a day?

16                     MR. BAUER:   Objection as to

17         form.

18         A.          As far as exactly ten hours,

19   yes, I'll get out maybe a quarter after 5, 5:30

20   if I'm not done.

21         Q.          In terms of the profit and loss

22   at a store, what, if any, involvement do you

23   have in controlling that?

24         A.          It kind of goes in conjunction

25   with the shrink you were talking about.  My job

148

1                          J. Paparatto

2     is based on the profit.

3              Q.      What do you mean?

4              A.      My job is to make sure the store

5     is functioning at its best to increase sales and

6     increase profits.  I could base most of my job

7     around that; getting the stock out, making sure

8     the cashiers are performing and getting the

9     customers in and getting the customers out.

10    Make sure the store is full, neat, clean and

11    packed.  That is my job description, I'm all

12    about the profit and the sales.

13             Q.      That's a merchandising position?

14                     MR. BAUER:  Objection as to

15             form.

16             A.      Any -- that's operations, that's

17    merchandising, your job as a manager is to

18    produce, supervise your subordinates and make

19    sure you are functioning at peak.

20                     As far as the loss, we protect

21    the assets, you want to reduce the amount of

22    paperwork errors.  You brought up paperwork

23    errors before.  Is there a retraining necessary

24    to get these associates, you know, not making

25    paperwork errors, you know, how can we eliminate

Caruso Court Reporting, Inc.      (516) 695-3722

185

1

2                    A C K N O W L E D G E M E N T

3

4     STATE OF   *CT*  )

5     COUNTY OF         ) ss.:      *City of Naugatuck*
                        ) *New Haven*

6

7                    I have read the foregoing record

8     of my testimony taken at the time and place

9     noted in the heading hereof and I do hereby

10    acknowledge it to be a true and correct

11    transcript of same.

12

13

14                              JOSEPH PAPARATTO

15

16

17

18

19    Subscribed and sworn to

20    before me this  28  day

21    of  March            , 2012.

22    _____
                NOTARY PUBLIC

23

24                    Janet M Moore
                      Notary Public, Connecticut
25                    My Commission Expires Mar. 31, 2014

Caruso Court Reporting, Inc.     (516) 695-3722

# Exhibit 5

STATE OF NEW YORK        §
                                            §

COUNTY OF NASSAU       §

## AFFIDAVIT OF ANDREA CASALE

BEFORE ME, the undersigned notary, on this day, personally appeared ANDREA CASALE, a person whose identity is known to me or who showed a valid driver's license and who upon her oath swore after I administered an oath to her upon her oath she states as follows:

1. My name is Andrea Casale. I am over the age of 18 and am of sound mind and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I began my employment with T.J. Maxx in Hicksville, New York, on May 17, 2005 as a Merchandise Coordinator. I was paid on an hourly basis.

3. As a Merchandise Coordinator, I had to clock in and clock out each day as I was paid by the hour. Sometimes I worked overtime, but I was told by my Store Manager not to punch out and that my Store Manager would punch me out. I later learned that my Store Manager did punch the time card for me. However, the time card would not show the extra hours that I worked.

4. My Manager told me that he needed to get approval from his District Manager about whether or not he could grant me overtime.

5. As a Merchandise Coordinator, my duties involved receiving shipments, separating merchandise, preparing it to go out on the floor and then merchandising the items on the floor. However, I was often asked to ring the register even though these were not my duties as a Merchandise Coordinator. I would have to ring the register sometimes up to five hours at a time, which left very little time for me to fulfill my duties merchandising the floor.

6. I was promoted to Key Carrier in 2006, but the promotion involved no change in my hourly rate. I was still paid by the hour. I asked my Store Manager for a raise, and he told me that the District Manager said, "This position does not come with a raise." I was responsible for opening the store alone and performing hourly work. However, I still requested to receive a raise and told my manager

Affidavit of Andrea Casale

that "I do not want to work for free." As a result, I received a seventy-five cent raise.

7. In July of 2007, I was promoted to Assistant Store Manager and received a salary rather than an hourly rate. I was required to drive from Hicksville to Riverhead each day for six weeks for training. During the training, I often rang the registers, helped with merchandising, unloaded the truck, and did very little managerial work. The Manager at the Riverhead store showed me a manual with a description of assistant manager duties, but I was not provided with much hands-on training to become an Assistant Manager. I was constantly receiving truck shipments, merchandising, and ringing the register — duties traditionally performed by hourly workers.

8. Also while in training, I had to work a three-day consecutive visit in Riverhead, requiring me to drive to Riverhead from Hicksville, arrive at the store at 7 a.m. and leave at 11 p.m. each day.

9. I requested to be reimbursed for gas money while in training. This request was denied.

10. I also was sent to an Assistant Manager training that took place in New Jersey. Assistant Managers from all different locations came to this training. In the training, I recall being taught how to prevent unions from forming in our stores.

11. In September of 2007, I was placed in the Commack T.J. Maxx store as an Assistant Manager. As an Assistant Manager I received a starting salary of $37,500. I regularly performed duties of an hourly worker, I worked between sixty and eighty hours per week, and I had to work almost every weekend.

12. I also worked in other T.J. Maxx stores as an Assistant Manager. I worked in Kings Park, Oceanside, Massapequa, Selden, and Rosedale. My experiences at all the stores was the same.

13. At each of these locations, I worked with a number of Assistant Managers, at least five to ten, but sometimes more, and for each Assistant Manager the duties were the same. All of the Assistant Managers were heavily involved in performing hourly duties including unloading the truck, ringing the registers, cleaning the store, merchandising, and stocking the store.

14. Assistant Managers, regardless of their locations were seen as "the clean-up crew" when any store in the vicinity was going to receive a visit from corporate. All Assistant Managers in the vicinity would be required to go to a particular store to help clean and merchandise.

15. However, when corporate or a District Manager visited a store, Assistant managers were not to perform the hourly type duties we normally did. I was told

Affidavit of Andrea Casale

to watch the frontend, but my store Manager told me not to ring because the District Managers could not see us ringing.

16. When I unloaded the truck, sometimes I was actually working in the truck, opening up boxes, sorting items, and then bringing merchandise into the store.

17. Some days I had to work from open to close. I would receive merchandise and carry merchandise from the truck to inside the store. Most days I worked from 7 a.m. until 7 p.m., six days per week. If I tried to take a break, my Manager would give me dirty looks, so I often worked straight hours and I never had enough help from other associates.

18. I also had to clean the bathrooms often. The restroom had a list with a manager schedule on it. We had to clean the restroom every day and sign the sheet on the wall when we cleaned. However, there were other times when I was ringing the register and I could not get proper relief to use the bathroom myself. I recall working a 12 hour shift and not being able to use the bathroom the entire day.

19. I worked like an animal – sometimes 12 hours a day, six days per week because we were required to. I had very few days off. I recall having oral surgery and having to come to work the following day. I could not move my mouth for a week and when I was ringing the register, a customer asked me, "Why are you not smiling?" I could not physically smile, move my mouth, or properly respond to the customer.

20. As an Assistant Manager I spent at least two hours per day ringing the register during the week. I always rang the register on the weekends.

21. At times, I also interviewed prospective associates; however, I always needed the approval of my Store Manager before being able to hire anyone.

22. In one circumstance I was able to fire an associate because Security personnel for T.J. Maxx saw that the employee had stolen merchandise and they told me that I needed to tell the employee that he was terminated. Other than in this instance, I did not have the authority to terminate employees.

23. Over ninety percent of my time was spent doing non-managerial duties. On Sundays, when I was required to do payroll, I did the payroll from 9 a.m. to 11 a.m. before the store opened, because once the store opened there were too many hourly duties to fulfill.

24. I resigned on October 31, 2008 because I found another job that was willing to pay me for the hours that I worked, and I did not want to work for a company that refused to pay me for the time that I put in.

Affidavit of Andrea Casale

25. In November of 2011, an attorney who represents T.J. Maxx contacted me. He told me that if I receive a subpoena from the Plaintiff's attorney to testify in court or any other capacity, I do not have to comply or do as it tells me to do. I told him that I could not ignore a subpoena and I would be more than happy to testify against T.J. Maxx.

26. If I was permitted to, I would want to join the lawsuit filed by Mohammed Ahmed against T.J. Maxx.


Further, Affiant sayeth not.

_Andrea Casale_
Andrea Casale


SWORN AND SUBSCRIBED TO BEFORE ME, the undersigned authority, by _Andrea Casale_ on this 21st day of November 2011.


My Commission Expires:


James Vagnini
Notary Public, State of New York
No. 02VA6081761
Qualified in Nassau County
Commission Expires 01/25/20 15

_Notary Public_
Notary Public


Affidavit of Andrea Casale

Exhibit 6

STATE OF NEW YORK          §
                          §
COUNTY OF NASSAU          §

### AFFIDAVIT OF ANN ESPOSITO

BEFORE ME, the undersigned notary, on this day, personally appeared ANN ESPOSITO, a person whose identity is known to me or who showed a valid driver's license and who upon her oath swore after I administered an oath to her upon her oath she states as follows:

1. My name is Ann Esposito. I am over the age of 18 and am of sound mind and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I was employed as a Coordinator in the Home Accents Department at T.J. Maxx in Oceanside, New York, from March 2008 until June of 2011. I was paid on an hourly basis.

3. I worked with Assistant Manager, Mohammed Ahmed, and witnessed Mr. Ahmed, as well as all of the Assistant Managers, involved in the same kind of work as hourly employees on a regular basis. Our Store Manager, Theresa Klotz would tell all employees, including Assistant Managers, what to do and we would have to do it, even if it went above and beyond our job descriptions. All hourly employees and Assistant Managers would have to work the registers, stock the shelves, unload the trucks, take out the garbage, and clean the bathrooms.

4. Shifts were disorganized. Store Managers required all employees, including Assistant Managers, to do all of this work at any given time took away from everyone's expected job responsibilities.

5. Based on my observations, Mr. Ahmed was treated the same way as all other Assistant Store Managers.

6. If Ms. Klotz was not at the store, she would give Mr. Ahmed and other Assistant Managers directions to give to the Coordinators and Associates. Assistant Managers simply relayed her directions to all other employees; they seemed to have limited authority of their own.

7. Assistant Managers had to work a lot more hours than I had to. They routinely worked hours in excess of forty in a work week.

Further, Affiant sayeth not.

Ann Esposito

SWORN AND SUBSCRIBED TO BEFORE ME, the undersigned authority, by
_____ on this 9 day of March , 2012.

My Commission Expires:

Notary Public

JUSTIN J. JANNONE
Notary Public, State of New York
No. 02JA5063585
Qualified in Nassau County
Commission Expires July 22, 20 14 .